UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAHONEY,** *et al.,* ) | |
| ) | **CIVIL ACTION NO.** |
| *Plaintiffs,* ) | |
| ) | _____ |
| **-vs.-** ) | |
| ) | |
| **NORTON**, *et al.,* ) | |
| ) | |
| *Defendants.* ) | |

### STATEMENT OF POINTS AND AUTHORITIES
### SUPPORTING THE MOTION FOR TEMPORARY RESTRAINING ORDER

Mahoney, Swindell, Christian Defense Coalition (CDC) and Generation Life (GenLife) offer

the following statement of points and authorities in support of their motion for a temporary

restraining order.

### STATEMENT OF FACTS[1]

In briefest essence, the facts are as follows:

Mahoney, Swindell, CDC and Generation Life obtained a permit for no more than twenty-

four persons to stand on the north sidewalk adjacent to Madison Avenue and the south sidewalk

adjacent to Jefferson Drive while displaying signs expressing their views about abortion.  See

Verified Complaint ¶¶ 58-65; Exhibit 7 to the Motion for Temporary Restraining Order (April 9,

2004 permit application amendment).  Subsequently, the National Park Service concluded that the

permit should be revoked because of another permitted demonstration occurring on the National

Mall at the same time.  See Verified Complaint ¶¶ 81-86; Exhibit 8 to Motion for Temporary

---

1.    Mahoney, Swindell, CDC, and GenLife incorporate, as though fully set out herein, the facts stated in paragraphs – through – of their Verified Complaint.

Page -1-

Restraining Order (Carlstrom/Merryman Letter at 3).[2] Consequently, Mahoney, Swindell, CDC and Generation Life, on one side, and the Secretary of the Department of the Interior and the National Park Service, on the other side, are disputing whether the Service must leave in place Mahoney's "deemed granted" permit to conduct demonstration activities on public sidewalks adjacent to the event of another permittee.

ARGUMENT

To obtain injunctive relief, the well-settled law of this Circuit requires the Plaintiffs to demonstrate (1) that they are likely to prevail on the merits, (2) that they will suffer irreparable injury if injunctive relief is denied, (3) that the granting of injunctive relief will not cause substantial harm to the other parties and finally, (4) that the granting of injunctive relief is in the public interest, or at least, not adverse to the public interest. Wisconsin Gas Co. v. FERC, 758 F.2d 669, 673-674 (1985); Washington Metropolitan Area Transit Authority v. Holiday Tours, Inc, 559 F.2d 841, 843 (1977); Virginia Petroleum Jobbers v. FPC, 259 F.2d 921, 925 (1958).

Mahoney and his associates are likely to prevail on their claims, see Arguments I-IV, infra. Further, they satisfy the requirement of showing irreparable injury, see Argument V, infra. The Defendants will not suffer any substantial harm if enjoined from arresting Reverend Mahoney for displaying signs as part of the crowd using the north sidewalk adjacent to Madison Drive and the south sidewalk adjacent to Jefferson Drive during the March for Women's Lives on April 25, 2004, nor will they be harmed by an injunction barring their revocation of the deemed granted permit and

---

2.    See Verified Complaint ¶¶ 79-86; Exhibit 8 to Motion for TRO (Carlstrom/Merryman Letter at 3) ("Accordingly, beside that the Mall's sidewalks cannot reasonably permit multiple occupancy, we also believe that the counter-demonstration would interfere with the safety, order, and convenience of the participants to the preexisting March for Women's Lives demonstration on the National Mall").

its deemed granted amendments, see Argument VI, infra. Finally, the interest of the public is with the preservation of constitutional rights, not their suppression; therefore the requested injunctive advances the public interest, see Argument VII, infra.

I.  THE COURT SHOULD GRANT THE REQUESTED RELIEF UNDER THE RULE IN *MAHONEY V. BABBITT*

If called upon to chart unknown waters of litigation between the parties here, this Court could hardly be blamed from running aground on a hidden reef of constitutional dimensions. But arguments that will be made to the contrary notwithstanding, the outcome of this case is determined by the prior decision of the D.C. Circuit in case remarkably similar to the present one. Because the Circuit Court has already explored these waters, this Court can easily resolve this dispute (and avoid running aground on constitutional shoals) by relying on the well-mapped decision of Mahoney v. Babbitt, 105 F.3d 1452 (D.C. Cir. 1997). While not intended to take the place of the discussion that follows it, the following table demonstrates the closely related character of the Mahoney v. Babbitt litigation:

| Then: **Mahoney v. Babbitt** | Now: **Mahoney v. Norton** |
|---|---|
| Another applicant applies for permit for large scale event | Another applicant applies for permit for large scale event |
| Competing applicant obtains "exclusive" permit for use of streets and sidewalks | Competing applicant obtains "exclusive" permit for use of streets and sidewalks |
| Mahoney applies for and is "deemed granted" a permit to display antiabortion signs | Mahoney applies for and is "deemed granted" a permit to display antiabortion signs |
| National Park Service revokes Mahoney's "deemed granted" permit | National Park Service revokes Mahoney's "deemed granted" permit |
| Mahoney applies in this Court for judicial relief | Mahoney applies in this Court for judicial relief |

| Then: **Mahoney v. Babbitt** | Now: **Mahoney v. Norton** |
|---|---|
| District Court denies Mahoney's requested relief | *To be determined* |
| Mahoney seeks emergency relief from the United States Court of Appeals for the District of Columbia Circuit | *To be determined* |
| D.C. Circuit grants Mahoney's requested injunction barring the National Park Service from interfering with sign displays by Mahoney and up to 24 others | *To be determined* |

In Mahoney v. Babbitt, 105 F.3d 1452 (D.C. Cir. 1997), the D. C. Circuit issued an injunction virtually identical to the Order requested in the present motion for a temporary restraining order.[3]  The dispute resolved in Mahoney v. Babbitt was subsequently summarized in the D.C. Circuit opinion rejecting the Secretary of the Interior's motion to vacate the judgment in that case. See Mahoney v. Babbitt, 113 F.3d 219, 220 (D.C. Cir. 1997).  There, the Court stated:

> While we have set forth the background of this controversy in our earlier opinion, Mahoney v. Babbitt, 105 F.3d 1452 (D.C. Cir. 1997), we will briefly review its history as is necessary for the resolution of the petition now before us. On December 23, 1996, the Reverend Patrick J. Mahoney and the Christian Defense Coalition ("appellants") filed their complaint seeking, inter alia, preliminary and injunctive relief against defendants carrying out threats to arrest Mahoney and his associates if they displayed signs critical of President Clinton on sidewalks adjacent to Pennsylvania Avenue during the Inaugural Parade scheduled for January 20, 1997. Defendants opposed plaintiffs' motion for preliminary injunction. Because of the shortness of time before the critical events, on January 3, 1997, plaintiffs moved to accelerate the hearing on the preliminary injunction. On January 16, the Thursday before the scheduled parade of Monday, January 20, the District Court denied the

---

3.    Compare 113 F.3d at 220 ("enjoining appellees and their agents 'from arresting or interfering with one or a group of twenty-five or fewer of the plaintiffs displaying signs at the Inaugural Parade expressing criticism of the President of the United States or his policies except in circumstances in which appellees and their agents would arrest or interfere with individuals displaying signs not critical to the President or his policies'") with Mahoney v. Norton, No. 04cv____ (D.D.C. Motion for Temporary Restraining Order) (same; Jefferson and Madison Drive sidewalks).

preliminary injunction.

> Mahoney and his associates remained under threat of arrest if they exercised their First Amendment rights by displaying signs critical of the President under circumstances in which defendants had admitted that persons displaying signs supportive of the President would not be arrested. Appellants appealed. On Saturday, January 18, appellants filed an emergency motion for injunction pending appeal from the denial of the preliminary injunction. In view of the critical shortage of time, we expedited the proceeding. Appellees filed opposition to the preliminary injunction. The American Civil Liberties Union filed a brief as amicus curiae, and on Sunday, January 19, we issued our order preliminarily enjoining defendants. Our order granted the emergency motion in part, enjoining appellees and their agents "from arresting or interfering with one or a group of twenty-five or fewer of the plaintiffs displaying signs at the Inaugural Parade expressing criticism of the President of the United States or his policies except in circumstances in which appellees and their agents would arrest or interfere with individuals displaying signs not critical to the President or his policies." Appellants did not seek a stay, either from this court or from the Circuit Justice or any other Justice of the Supreme Court. See 28 U.S.C. § 2101(f); SUP. CT. R. 22-23. On January 20, the Inaugural Parade was held as scheduled. Our order was effective, and appellants were able to display their signs on the same terms as citizens having different viewpoints.

113 F.3d at 220.

Oddly, the existence of both decisions of the D.C. Circuit in the Mahoney v. Babbitt litigation appears to have escaped the attention of the National Park Service. In the letter announcing the revocation of Mahoney's deemed granted permit, the Service's representatives discuss two prior decisions involving the Park Service's regulation at issue here: Sanders v. United States, 518 F. Supp. 728 (D.D.C. 1981), aff'd without opinion, 679 F.2d 262 (D.C. Cir. 1982); and, Torossian v. Hayo, 45 F. Supp. 2d 63 (D.D.C. 1999). Both cases relate to the state of the law before the decisions of the D.C. Circuit in the Mahoney v. Babbitt case.

Sanders was discussed by the D.C. Circuit in Mahoney and rejected as a ground for denying

relief to Mahoney. See 105 F.3d at 1457.[4] The same factors identified in Mahoney as proper grounds for distinguishing that case from Sanders are present in the instant application. And, while the Sanders decision did not bind the D.C. Circuit, the Mahoney v. Babbitt decision of the D.C. Circuit certainly does bind this Court.

Torossian was decided after Mahoney but concerns itself with an incident that took place prior to Mahoney during the 1995 Million Man March on Washington. See Torossian v. Hayo, 45 F. Supp. 2d 63, 64-66 (D.D.C. 1999). The sole question at stake in Torossian, whether Park Service police officers would be allowed a defense of qualified immunity, addressed the state of the law at a time prior to the decision of the D.C. Circuit in Mahoney v. Babbitt. Thus, even if the conclusion in Torossian is technically correct, not a point that the Plaintiffs concede here, it reflects the state of the law at a time prior to the binding decision in Mahoney.

Given the prior decisions of the D.C. Circuit in Mahoney v. Babbitt, it is understandable why

---

4.    The Mahoney Court had little difficulty distinguishing Sanders:

> Attempting to offer a prior example of such a successful suppression, the government points to Sanders v. United States, 518 F. Supp. 728 (D.D.C. 1981), aff'd, 679 F.2d 262 (D.C. Cir. 1982), in which District Judge Smith upheld the arrest of a demonstrator for silently demonstrating with four signs within the Christmas Pageant for Peace on the Ellipse. While of course that district court's decision would not be binding authority upon this court, it is not on point even if it were. In Sanders, before deciding that the regulation under which the plaintiff had been arrested was a reasonable time, place, and manner restriction serving a significant government interest, Judge Smith was at pains to identify what that "case [did] not concern." 518 F. Supp. at 729. He made clear that there was "no allegation of either impermissible discrimination or arbitrariness in the application of [the] policy," and even more tellingly that "there [was] no suggestion that this plaintiff's arrest was in any way based on the content of his views." Id. Finally, Judge Smith assured himself that the area to which the prohibition applied did not extend "beyond the immediate area used and needed by the Pageant." Id. All of these factors are dramatically and critically opposite to the present case.

105 F.3d at 1457 (emphasis added).

the National Park Service might not focus attention on those cases.  Mahoney compels the conclusion here that the revocation of Mahoney's permit violated the First Amendment.

II.    THE NATIONAL PARK SERVICE VIOLATED REVEREND MAHONEY'S RIGHTS TO DUE PROCESS OF LAW

The National Park Service and Secretary Babbitt have violated the due process rights of Reverend Mahoney and the Christian Defense Coalition.  The Defendants have enacted and enforced a vague regulation restricting access to park properties.

The National Park Service requires those who conduct demonstrations or special events in the National Capitol area parks, with certain exceptions not relevant here, to obtain a permit from the Service.  36 C.F.R. Chapter 1, § 7.96(g)(3) describes the permit application rules.  In accord with (g)(3) and the constitutional requirements of the prior restraint doctrine, a permit application that is fully executed is "deemed granted" "unless denied within 24 hours of receipt."  36 C.F.R. Chapter 1, § 7.96(g)(3).  This subsection further states, "where a permit has been granted, or is deemed to have been granted … the Field Director may revoke that permit" in accord with §7.96(g)(6).

Under § 7.96(g)(6),

"[a] permit issued for a demonstration is revocable only upon a ground for which an application therefor would be subject to denial under paragraphs (g) (4) or (5) of this section.  Any such revocation, prior to the conduct of the demonstration, shall be in writing and shall be approved by the Field Director."

In turn, subsections (g)(4) and (5) provide various rules on the processing of applications (subsection (g)(4)) and on the limitations applicable to permits (subsection (g)(5)).  Subsection (g)(4)(i) states, "[p]ermit applications for demonstrations and special events are processed in order of receipt, and the use of a particular area is allocated in order of receipt of fully executed applications .…"

Subsection (g)(4)(iii) states, "[a] permit may be denied in writing by the Field Director [if] [a] fully executed prior application for the same time and place has been received, and a permit has been or will be granted authorizing activities which do not reasonably permit multiple occupancy of the particular area .…"

The particular problems of vagueness in the challenged regulations, as identified above, are the concept of "deemed granted" permits, the concept of "fully executed applications," and the revocation of "deemed granted" permits where "a permit has been or will be granted authorizing activities which do not reasonably permit multiple occupancy .…"'

Any regulation that lacks "ascertainable standards" violates due process and is therefore unconstitutionally vague. Winters v. New York, 333 U.S. 507, 515 (1948). 36 C.F.R. Chapter 1, § 7.96 is such a regulation. It is phrased "in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Construction Co., 269 U.S. 385, 391 (1926). As a consequence, the regulation violates the "first essential of due process of law," fair notice.[5] Further, when the National Park Service undertakes to regulate First Amendment activities, it must do so only with a "narrow, objective, and definite standard,"

---

5.     The United States Supreme Court has explained that vague enactments are unconstitutional because they violate two fundamental principles of due process, fair notice and nondiscriminatory enforcement.

> First. because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.[ ]

Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972) (footnotes and quotations omitted).

Shuttlesworth v. City of Birmingham, 394 U.S. at 151, so that persons exercising freedom of speech will not be required to "steer far wider of the unlawful zone … than if the boundaries of the forbidden areas were clearly marked." Grayned v. City of Rockford, 408 U.S. 104, 109 (1972) (internal quotation marks omitted). This standard of clarity to which enactments affecting free speech, like the regulation here, must adhere is far more stringent than that applied in other contexts. See Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 498 (1982) ("[i]f, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply"); Smith v. Goguen, 415 U.S. 566, 573 (1974) ("[w]here a statute's literal scope … is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts"). Thus, while mathematical exactitude may not be required in some contexts, this closer standard of scrutiny leads ineluctably to the conclusion that the regulation is unconstitutionally vague.

For example, what else than Lewis Carroll's disappearing Cheshire Cat is a "deemed granted" permit? Although "deeming" to grant a permit may, on the face of it, obviate one time frame concern addressed within the prior restraint doctrine, what is the impact of "deeming" to grant permits on the exercise of the right to freedom of speech? Reverend Mahoney and the Christian Defense Coalition knew, as a consequence of the National Park Service's inaction, that they had obtained a permit on or around November 14, 1996. But, to their confusion and consternation, § 7.96(g)(3) declares that their permit is a "deemed granted" permit.

Still, a permit is a permit. Or, is a permit a permit? For the National Park Service reserves, it appears, to itself the right to **revoke** a "deemed granted" permit. That a "deemed granted" permit

is subject to revocation rather than denial is powerful support for the reasonableness of the common man's understanding that a "deemed granted" permit is a valid, legitimate permit. Clearly, the meaning of a "deemed granted" permit is not clear. In that regard, the Supreme Court has said,

> "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."

Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972) (footnotes and quotations omitted). Here, Mahoney, Swindell, the CDC and GenLife are the victims of the National Park Service's ad hoc, subjective, arbitrary and discriminatory action.

Finally, and importantly, in circumstances where competing applications may result in multiple occupancy of a site, what is the meaning of the regulatory standard reasonably permitted multiple occupancy? The regulation is completely silent on the meaning of this provision. The regulation does not state any standard for "reasonability" of multiple occupancy. It does not state that the judgment of "reasonability" is one to be made by the National Park Service in consultation with the applicant with the prior fully executed application. It does not bar the Service from allowing that unidentified applicant from deciding on completely subjective, even content- or viewpoint-based grounds, that multiple occupancy would be unreasonable.

In point of fact, based on comments of National Park Service representatives in this case, it appears that the Service consulted with representatives of a politically partisan applicant, the organizers of the March for Women's Lives, to decide the reasonability of a multiple occupancy on the sidewalks in question on April 25, 2004. See Verified Complaint ¶¶ 73-76; Exhibit 1 to Motion

for TRO at ¶¶ 51-55. But even if the National Park Service did not actually consult with the organizers of the March for Women's Lives, the regulation is crafted to permit such consultation and to permit content- and viewpoint-based considerations to decide whether or not a multiple occupancy is reasonable. Such vagueness in a system of regulations affecting the right to freedom of speech is particularly dangerous, and subject to exacting scrutiny.

These regulations do not pass constitutional muster. The unconstitutional vagueness of the challenged provisions of the National Park Service regulation is obvious. A person of common intelligence who reads the regulation would be unable to derive a precise interpretation. As a result, persons desiring to exercise freedom of speech are required to "steer [even farther away from] . . . the unlawful zone." Grayned, 408 U.S. at 109.

Because the regulations are unconstitutionally vague, they have a chilling effect on persons, like Mahoney, Swindell, the CDC and GenLife, who seek to exercise their constitutional rights of free speech. For these reasons, the National Park Service regulations are unconstitutional in the respects noted above and their use against the Plaintiffs constitutes a due process violation that must be enjoined.

III.    THE REVOCATION OF THE DEEMED GRANTED PERMIT AND THE THREAT OF ARREST FOR DEMONSTRATING WITHOUT A PERMIT VIOLATE CONSTITUTIONAL PRINCIPLES EMBODIED IN THE PUBLIC FORUM DOCTRINE

    A.    INTRODUCTION

The Supreme Court employs "forum" analysis to resolve claims of access to public property for purposes of free speech. Cf., e.g., Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37 (1983) (internal mail system of public school not a traditional or

designated public forum); United States v. Grace, 461 U.S. 171 (1983) (public sidewalk surrounding U.S. Supreme Court is a traditional public forum); Cornelius v. N.A.A.C.P. Legal Defense and Education Fund, Inc., 473 U.S. 788, 797 (1985) (Combined Federal Campaign is not a traditional or designated public forum).  As exemplified in Cornelius, the analysis proceeds in three steps.

First, the activity threatened or affected by government action must be identified, and it must be determined whether it is speech protected under the First Amendment. Id. (Obviously, in cases not involving expression or expressive activities, the analysis concludes here.)  Second, it is essential to "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." Id.  Third, where constitutionally protected speech is at stake, the government action must be analyzed according to the standards applicable to the relevant forum. Id.

When forum analysis is applied in the instant case, Reverend Mahoney's claims for injunctive and declaratory relief are demonstrably well-founded and justified.

B.   REVEREND MAHONEY'S PEACEFUL, PUBLIC ADVOCACY ON A SIDEWALK IN DOWNTOWN WASHINGTON IS PROTECTED SPEECH

As explained in the Statement of Facts, the Plaintiffs plan to demonstrate during the Inaugural Parade, on the public sidewalks of Pennsylvania Avenue.  Their demonstration will consist of the displaying of signs depicting the consequences of late term abortions, and exposing what they perceive to be President Clinton's strong support for abortion rights generally and his veto of the partial birth abortion ban.  Their signs may include messages reproving President Clinton and admonishing him to turn from his sins.

It is an axiom of the Constitution that religious speech and discussion "are forms of speech

protected by the Constitution." <u>Widmar v. Vincent</u>, 454 U.S. 263, 269 (1981); <u>Heffron v. ISKCON, Inc.</u>, 452 U.S. 640 (1981).  Reverend Mahoney's and the Christian Defense Coalition's religious display, depicting the consequences of legalized abortion in the United States, "far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." <u>Capital Square Review and Advisory Board v. Pinette</u>, 132 L.Ed.2d 650, 660 (1995) (citing cases).  Further, their use of signs to draw down public attention on what they perceive as President Clinton's sins against God and crimes against humanity are protected expression. Displaying signs and placards addressing public issues is a form of free speech resting "at the core of the First Amendment," <u>Boos v. Barry</u>, 485 U.S. 312, 318 (1988) (and cases cited).  <u>Accord</u> <u>United States v. Grace</u>, 461 U.S. 171, 176-77 (1983) (and cases cited); <u>cf.</u> <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 119 (1972) ("classic expressive gesture of the solitary picket").

      C.       <u>THE SIDEWALKS JUST SOUTH OF JEFFERSON DRIVE AND JUST NORTH OF MADISON DRIVE ARE TRADITIONAL PUBLIC FORUM PROPERTIES</u>

The locations in dispute are peripheral sidewalks to the National Mall.  Specifically, Mahoney, Swindell, the CDC and GenLife obtained a permit to use the sidewalk just north of Madison Drive, across the street from the National Mall, and the sidewalk just south of Jefferson Drive, also just across the street from the Mall.

These sidewalks are traditional public forum properties.  They are open.  They are continuous through a significant portion of the District of Columbia.  They are used for all manner of normal pedestrian and commercial activities.

Access to these sidewalks is unrestricted.  There are no gates nor guards.  There are no requirements for identification cards or passes.  The layout of these sidewalks encourages the public

to sightsee, to patronize nearby businesses and amenities, and to enjoy the majestic vistas along this avenue.  Nothing sets these sidewalks apart from any other sidewalk in the City of Washington.

The Supreme Court has repeatedly held that "streets, sidewalks, and parks, are considered, without more, to be public forums [sic]."  United States v. Grace, 461 U.S. 171, 177 (1983) (and cases cited).  It is well settled that:

> [w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.  Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

Hague v. C.I.O., 307 U.S. 496, 515 (1939) (plurality opinion).

Thus, streets, sidewalks, and parks represent "quintessential public forums."  Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 45 (1983).  On the range of properties open in varying degrees to expressive activities, the sidewalks adjacent to Madison and Jefferson Drives lie at the very "end of the spectrum."  Id.

D.    THE REVOCATION OF THEIR PERMIT AND THE THREAT TO ARREST THEM FOR DEMONSTRATING WITHOUT A PERMIT VIOLATES THE PLAINTIFFS' CONSTITUTIONAL RIGHTS

In traditional public fora, like the Madison Drive and Jefferson Drive sidewalks, "the government's ability to permissibly restrict expressive conduct is very limited."  United States v. Grace, 461 U.S. at 177 (quoting Perry, 460 U.S. at 45) (additional citations omitted).  This conclusion results from the fact that "[o]ne who is rightfully on a street [or a sidewalk] open to the public 'carries with him there as elsewhere the constitutional right to express his views in an orderly fashion.'"  Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 810

(1984) (quoting Jamison v. Texas, 318 U.S. 413, 416 (1943)) (additional citation omitted). In fact, "[r]egulation of speech activity on governmental property that has been traditionally open to the public for expressive activity, such as public streets and parks, is examined under strict scrutiny." United States v. Kokinda, 497 U.S. 720, 726 (1990). In Capital Square Review and Advisory Board v. Pinette, 132 L.Ed.2d 650, 660 (1995), the Court explained that in a traditional public forum property, "the right to limit protected expressive activity is sharply circumscribed: it may impose reasonable, content-neutral time, place and manner restrictions … but it may regulate expressive content only if such a restriction is necessary, and narrowly drawn, to serve a compelling state interest."

Two government actions have injured, or threaten to injure, the Plaintiffs in the exercise of their First Amendment rights: the revocation of a permit to demonstrate in a traditional public forum property; and, the threat to arrest and prosecute for demonstrating without a permit. Both of these actions fail the relevant standards of scrutiny.

1.    *The National Park Service's Actions Reflect The Service's Consideration Of The Content Of the Plaintiffs' Speech But Are Unrelated To Any Compelling Government Interest.*

a.    Even assuming arguendo that the revocation of the permit was the result of a content-neutral regulation, the regulation was not narrowly tailored because of its vesting of discretion in licensing officials. Under strict scrutiny, the restrictions placed on the Plaintiffs' speech "will be upheld only if narrowly drawn to achieve a compelling interest." Grace, 461 U.S. at 177. "In order to qualify as narrowly tailored, a content neutral ordinance must avoid vesting … officials with discretion to grant or deny licenses." Miami Herald Pub. Co. v. City of Hallandale,

734 F.2d 666, 673 (1984), aff'd 742 F.2d 590 (11th Cir. 1984).  See Forsyth County. v. Nationalist Movement, 505 U.S. 123, 132-33 (1992).  But, as demonstrated within, the National Park Service's regulation vests unbridled discretion in officials to revoke "deemed granted" permits.  That discretion is embodied in the provision of the regulation that allows multiple occupancy of permitted sites where such occupancy is "reasonable."  Thus, the unbridled discretion allowing the National Park Service to determine who may demonstrate clearly violates the Miami Herald standard.

There are no objective standards to guide the National Park Service in deciding whether multiple occupancies are reasonable..  The fact that there are no articulated standards renders the National Park Service's decisions discretionary.  This is unconstitutional.  Id.  No compelling government interests can exist for a wholly discretionary permit requirement for free speech on a traditional public forum.  The National Park Service's regulations give Service officials the type of unbridled discretion uniformly declared unconstitutional by the Supreme Court.  See Forsyth County, 120 L.Ed.2d at 111 (if a permit scheme "involves appraisal of facts, the exercise of judgment, and the formation of an opinion [cit.] by the licensing authority, the danger of censorship and of abridgement of our precious First Amendment freedoms is too great to be permitted") (citations and quotation marks omitted); see also Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51 (1969); Freedman v. Maryland, 380 U.S. 51 (1965).

b.      The National Park Service regulation and the threat to arrest are not content-neutral.  In a traditional public forum, the distinction between a content-based regulation and a content neutral time, place, and manner regulation is a crucial one.  Any regulation of the time, place, and manner of protected speech must not be based on the content of the message.  Forsyth

County. v. Nationalist Movement, 120 L.Ed. at 101.  Yet the challenged regulation allows such content- based decisions.  Section 7.96(g)(4) allows the revocation of "deemed granted" permits where "multiple occupancy" is not reasonable; yet the section is not written or construed authoritatively to prevent disdain for viewpoint or content from being the basis on which a judgment of unreasonability rests.

If "it is the content of the speech that determines whether it is within or without the [regulation's] blunt prohibition," it is unconstitutional.  Carey v. Brown, 447 U.S. 455, 462 (1980); see also Police Dept. v. Mosely, 408 U.S. 92, 95-96 (1972) ("[s]elective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone."). Because the National Park Service regulation and the threat of arrest both rest on the incompatibility of the Plaintiffs' message with that of the March for Women's Lives, it is impossible for the National Park Service to act on a permit without inquiry into the content of the applicant's speech.

This is precisely what is prohibited by the United States Constitution.  In fact, the Supreme Court has held:

> any permit scheme controlling the time, place, and manner of speech must not be based on the content of the message . . . . The reasoning is simple:  If the permit scheme "involves appraisal of facts, the exercise of judgment and the formation of an opinion, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great" to be permitted.

Forsyth County. v. Nationalist Movement, 120 L.Ed. at 111 (quoting Cantwell v. Connecticut, 310 U.S. 296, 305 (1940);  Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975)).

IV.    THE NATIONAL PARK SERVICE REGULATION IS AN UNCONSTITUTIONAL PRIOR RESTRAINT

The National Park Service regulation is a prior restraint.

It restrains and inhibits expression before it takes place, and gives the National Park Service the right to deny expression altogether.  See 36 C.F.R. Chapter 1, § 7.96(g).  While permit schemes may be treated as time, place, and manner restrictions on expression when they are free from reliance upon the content of communications for their operation, see Thomas v. Chicago Park District, 534 U.S. 316, 322-23 (2002), the National Park Service regulation directly embodies the devices of content and viewpoint consideration within the permit scheme it adopts.  As the United States Supreme Court has stated, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."  New York Times Co. v. U.S., 403 U.S. 713, 714 (1971) (quoting Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963)).  The National Park Service "`thus carries a heavy burden of showing justification for the imposition of such a restrain.'"  New York Times, 403 U.S. at 714 (quoting Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971)).  In this case, the National Park Service simply cannot sustain the burden of justifying the systematic restraint of speech it has imposed.

> A.     THE REGULATION IS A CLASSIC PRIOR RESTRAINT

In reviewing its prior restraint cases, the Supreme Court noted, "the regulations we have found invalid as prior restraints have `had this in common:  they gave public officials the power to deny use of a forum in advance of actual expression.'"  Ward v. Rock Against Racism, 109 S.Ct. 2746, 2756, n.5 (1989) (quoting Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975)).  Clearly, the regulation permits demonstrations when the National Park Service issues a permit and denies the use of a forum before any demonstration can occur if no permit is obtained.

36 C.F.R. Chapter 1, § 7.96(g) is a unconstitutional prior restraint because it vests unbridled

discretion in the National Park Service to revoke "deemed granted" permits and no definite or certain standards are provided to limit or guide the exercise of that discretion. The Supreme Court has said, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51 (1969). Such a restraint is worse than a badly drawn law, it is no law at all: the Court has made "clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license." Id. at 151.

B.   THE REGULATION IS AN IMPERMISSIBLE PRIOR RESTRAINT BECAUSE IT IMPOSES AN ADVANCE NOTICE REQUIREMENT

36 C.F.R. Chapter 1, § 7.96(g)(2) subjects all demonstrations in National Capitol parks to a permit requirement (with the exception of certain demonstrations involving fewer than twenty-five people). Other than the exception for demonstrations involving few people,[6] the regulation bans all demonstrations without prior official consent. An application for a permit must be made in advance of any desired activity.[7]

The Supreme Court has stated emphatically that requiring advance notice to government of the intent to exercise First Amendment rights is "quite incompatible with the requirements of the

---

6.   The exception for fewer than 25 demonstrators did not prevent the D.C. Circuit from granting the requested emergency relief in Mahoney, 105 F.3d at 1457-58.

7.   Any permit application under the National Park Service regulation necessarily requires the applicant to identify himself and the type of activity in which he wishes to engage. The United States Supreme Court, however, has unequivocally upheld the constitutional right to be free from such identification requirements. Talley v. California, 362 U.S. 60 (1959); see also Thomas v. Collins, 323 U.S. 516, 540 (1944); McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995).

First Amendment." Thomas v. Collins, 323 U.S. 516, 540 (1944) (overturning requirement of advance registration before engaging in labor organization activities, including public speeches). Speech, whether celebration, protest, or education, often represents an immediate response to some specific event. Yet the National Park Service demands 48 hours advance notice and imposes the permit requirement to enforce its asserted right for advance notice.

      C.      36 C.F.R. CHAPTER 1, § 7.96(g) IS DEVOID OF PROCEDURAL SAFEGUARDS

The National Park Service regulation lacks requisite procedural safeguards for a speech licensing scheme. To survive constitutional attack, a system of prior restraint must be accompanied by adequate procedural safeguards. First, denials of the right to speak must be of brief duration for purposes only of maintaining the status quo. Second, the licensing scheme must require quick judicial review of the decision. And third, where grave dangers of censorship are present as here, the government must bear the burden to initiate court action and prove its grounds for denial of the right to engage in expressive activity. FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 227 (1990).

Under 36 C.F.R. Chapter 1, § 7.96(g)(3), a permit is "deemed granted" if the National Park Service has not denied an application within 24 hours of filing. The evanescent "deemed granted" permit, however, may be revoked as provided by § 7.96(g)(6). The regulation provides absolutely no time limit on the power of the National Park Service to revoke a "deemed granted" permit.

Worse, arrest, incarceration and fines await those who run afoul of the provisions of the regulation, chilling individual exercise of protected free speech activities. "[T]he failure to place limitations on the time within which a censorship board decision maker must make a determination . . . is a species of unbridled discretion." FW/PBS, Inc., 493 U.S at 223 (citing Freedman v.

Maryland, 380 U.S. 51 (1965)).  The extended time limit, built into the system of "deeming granted"

permits, "'create[s in every application] an impermissible risk of suppression of ideas.'" Id. (quoting

Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 798, n. 15 (1984)).[8]

Nor does the regulation require prompt judicial review of the National Park Service's

decisions to revoke permits.  Instead, the entire burden of initiating judicial proceedings is placed

on the individual who desires to engage in protected speech activities.   Where grave dangers of

censorship are present, as they are here, the government must bear the burden to initiate court action

and prove its grounds for denial of the right to engage in expressive activity.  FW/PBS, Inc., 493

U.S. at 227 (1990).

V.    IRREPARABLE HARM WILL RESULT TO THE PLAINTIFFS ABSENT AN ORDER
      FROM THIS COURT

The Plaintiffs seek to engage in a protected form of expression on a traditional public forum

property, and are prevented from doing so by the action of federal government agencies and their

employees.  Their injuries, sustained in the revocation of their permit and threatened in the form of

future arrests, are classic deprivations of First Amendment rights.  Even  the momentary loss of

these freedoms is irreparable.  Loss of a First Amendment right is irreparable because it is an injury

that cannot be fully compensated by later damages.  See, e.g., Elrod v. Burns, 427 U.S. 347, 373

(1976);  New York Times Co. v. United States, 403 U.S. 713  (1971);  White House Vigil for the

---

8.    Riley v. National Federation of the Blind, 487 U.S. 781, 802 (1988) ("Generally, speakers need not obtain a license to speak …. Even assuming that the State's interest does justify requiring [Defendant] to obtain a license before [individual advocacy], such a regulation must provide that the licensor will, within a specified brief period, either issue a license or go to court.  That requirement is not met here, for the [regulations permit indeterminate delays between "deeming granted" a permit and its subsequent revocation] without limit ….  Delay compels the speaker's silence.  Under these circumstances, the licensing provision cannot stand") (citation and internal quotation marks omitted).

ERA Comm. v. Watt, 717 F.2d 568 (D.C.Cir.1983); A Quaker Action Group v. Hickel, 421 F.2d

1111, 1116 (D.C.Cir.1969); Waters v. Barry, 711 F. Supp. 1121, 1123 (D.D.C. 1989); Community

for Creative Non-Violence v. Carvino , 648 F. Supp. 476, 479 (D.D.C.), rev'd on other grounds sub

nom. Community for Creative Nonviolence v. Kerrigan, 865 F.2d 382 (D.C.Cir.1989).   The

Plaintiffs satisfy this element of the test for the issuance of preliminary injunctive relief.

VI.    THE DEFENDANTS WILL NOT BE HARMED BY THE ISSUANCE OF INJUNCTIVE
       RELIEF

There is no harm to the Defendants in the issuance of the requested injunction.   The

Defendants suffer no injury in being ordered by the Court, pending the disposition of this litigation,

not to enforce the unconstitutional portions of their regulations.  Nor do Defendants have an injury

of which they may fairly complain in being ordered not to carry out threats of arrest under the

unconstitutional portions of their regulations.

VII.   THE PUBLIC INTEREST WILL BE ADVANCED, NOT HARMED, BY THE ISSUANCE
       OF INJUNCTIVE RELIEF IN THIS CASE

The public interest lies with the vindication of the rights of the Plaintiffs in this case.

Certainly the religiously-animated political speech of the Plaintiffs is at stake, and the Plaintiffs are

distressed about the possible loss of those rights.   But there are larger issues at stake.

Unsurprisingly, citizens expect that when the federal government will not revoke permits and

threaten arrests on the justification that expression is from an unwelcome or unwanted point of view

or on a topic not favored by the Government.

So, while the government may assert that the interest of the public is in the vindication of

its regulations, it is plain that preventing governmental abuses of rights to freedom of speech, of

religion, of assembly, of petition, of due process, and of religion, advance the public interest.

CONCLUSION

For the foregoing reasons, the Court should grant the Temporary Restraining Order in the form submitted herewith and without bond.

Dated:  April 20, 2004.

Respectfully submitted,

_____
James Matthew Henderson Sr. # 452639
  *Counsel of Record*
Colby M. May # 394340
The American Center for Law and Justice
201 Maryland Avenue NE
Washington, DC  20002
Telephone:    (202) 546-8890
Facsimile:    (202) 337-3167

*Attorneys for the Plaintiffs*