UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Rev. Patrick Mahoney,    )
             et al.,    )
                        )
       Plaintiffs       )
       v.               )    No.
                        )
Secretary Gale Norton   )
             et al.,    )
                        )
       Defendants.      )
_____)

DECLARATION OF SALVATORE LAURO

I, Salvatore Lauro, pursuant to  28 U.S.C. § 1746, deposes and says as follows:

1.  I am a Major with the United States Park Police and I have been an officer with the Park Police for more than twenty-five years.

2.  Since February 2003, I have been the Commander of the United States Park Police's Special Forces Branch, which is responsible for crowd control at major demonstrations, special events, and other planned and unplanned events on Federal parkland within the National Park Service's National Capital Region.  The United States Park Police's Special Forces Branch also assists other Park Police units and parks throughout the National Park System in the event of law enforcement emergencies.

3.  Before then, from February 2002 to February 2003, I was a Captain and assigned as Commander of the Office of Planning and Development.  From March 1999 to February 2002, I was the

1

Assistant Commander of the United States Park Police's Special Forces Branch.

**Overview of the NPS's responsibilities in DC**

4.    D.C. Code Ann. § 10-104(a)(2001) provides that Federal parkland of the District of Columbia is under the exclusive charge and control of the Director of the National Park Service. Under D.C. Code Ann. § 10-138 (2001), it also has regulatory authority to "cover the sidewalks around the public grounds and carriageways of such streets as lie between and separate said public grounds."

5.    In the District of Columbia, the Federal parkland consists of approximately 8,500 acres and comprising almost 24% of the landmass of the District of Columbia.  Federal parkland includes not only the National Mall, the Washington Monument grounds, Rock Creek Park, Lafayette Park, the White House sidewalk, the Ellipse, Pershing Park, Freedom Plaza, the sidewalks adjacent to Pennsylvania Avenue from 15th-3rd Street, but scores of other parks located throughout the city.

**Overview of the Park Police's responsibilities in DC**

6. The United States Park Police is a Federal law enforcement organization within the National Park Service, U.S. Department of the Interior, and is responsible for law enforcement in all the park areas in the District.  The United States Park Police law enforcement authority is principally based

2

on three Federal laws, found at 16 U.S.C. § 1a-6(b), D.C.Code Ann. § 5-201 (2001), D.C.Code Ann. § 5-207 (2001), which are generally geographically based.

7. The United States Park Police, which has a wide range of law enforcement responsibilities within the National Park Service's National Capital Region, have approximately 586 uniformed officers, with approximately 437 of them stationed in the National Park Service's National Capital Region.  The remaining United States Park Police officers are stationed primarily at the San Francisco Field Office and the New York Field Office.

8.  Given its limited staffing in the Washington Metropolitan Area, the United States Park Police primarily focuses its law enforcement efforts within the Federal park areas.  This also includes, following the terrorist attacks of September 11, 2001, an additional focus on the protection of national park icons like the Lincoln and Jefferson Memorials, the Washington Monument as well as the parks surrounding the White House complex.

9.  Nevertheless, because the United States Park Police possess overlapping citywide law enforcement authority with the Metropolitan Police Department, United States Park Police officers who witness criminal offenses outside park areas do make arrests.  Indeed, the United States Park Police also

3

occasionally assists the United States Secret Service, the Metropolitan Police Department, and other Federal law enforcement agencies in the District of Columbia.

10.  The Park Police's Special Forces Branch has been involved in both the planning for and the law enforcement management of a series of demonstrations and counter-demonstrations scheduled for April 25, 2004, and which include the March For Women's Lives demonstration and march as well as at least two counter-demonstrations by Mr. Randall Terry and the Society For Truth and Justice and Rev. Patrick Mahoney and the Christian Defense Coalition.  In addition, during this time period the Park Police has been engaged in the planning and law enforcement management of demonstrations associated with the meetings of the World Bank and International Monetary Fund.

11.  The National Park Service's regulations for the National Capital Region provide a regulatory framework which accommodates a full range of demonstration and counter-demonstration activities.  Codified at 36 C.F.R. § 7.96(g), these regulations were developed to balance demonstration activities with the National Park Service's statutory mandate to provide for other visitor enjoyment and the preservation of park resources.

12.  Pursuant to National Park Service regulations found at 36 C.F.R. § 7.96(g)(2), demonstrations and special events may be held by permit.

4

13.  Under 36 C.F.R. § 7.96(g)(2)(i), there is an exemption from the permit requirement for demonstrations involving 25 persons or fewer, "provided that the other conditions required for the issuance of a permit are met and provided further that the group is not merely an extension of another group already availing itself under this provision or will not unreasonably interfere with other demonstrations or special events."

14.  A group planning a demonstration or special event may obtain a permit from the National Park Service in order to ensure access and a forum to express their views on federal parkland. Consistent with National Park Service regulations, the National Park Service endeavors to ensure that each permitted group or individual is able to express their views free from unreasonable interference or intrusion from other groups or individuals.  This is especially important since there are thousands of annual demonstrations and special events.

15.  In addition to preserving the rights of permitees to hold their events free from unreasonable interference and intrusion so as to protect the integrity of the permitted event, it is important to ensure safety and order for demonstrators and counter-demonstrators alike.  Allowing counter-demonstrators total freedom and access to an area under permit to an opposing group could easily result in disorder and major public disturbances that could be beyond the ability of Park Police

resources to address.

16.    Consistent with Park Service regulations, it is the Park Police's practice to inform counter-demonstrators who seek to intrude into an area permitted to another that the park area is already under a permit for another's demonstration.    We generally warn counter-demonstrators that they will be arrested if they continue to engage in counter-demonstrations within the area under a permit to another.    If available, we advise counter-demonstrators to relocate to any nearby park area not under permit to others.

17.    The National Mall is long-standing traditional site for demonstrations that champion a wide variety of causes. Activities here have ranged from the lone vigil to rallies involving hundreds of thousands of persons.    Lafayette Park and the White House sidewalk are also park areas which have been traditional venues for demonstrations on a wide range of domestic and international issues.

18.    Regardless of the particular park areas, demonstrations on both sides of contentious issues have successfully occurred due to the National Park Service and the United States Park Police's ability to keep competing groups separate and apart, while allowing both sides to express their views.    These demonstrations and counter-demonstrations have ranged from supporters and opponents of the 1995 White House/Israel/PLO

Signing Ceremony, the visits of the South Korean President and Pakistan Prime Minister, and the 1994 visit by the Emperor of Japan.

19.  Other examples include Act Now To Stop War & End Racism's (ANSWER) anti-Iraqi war demonstration on October 25, 2003, which brought over thirty thousand participants on the Washington Monument grounds.  At that time, a group of counter-demonstrators from the Street Preachers Alliance intruded into the permit area of the ANSWER demonstration.  Consistent with Park Service regulations and Park Police practice, the counter-demonstrators were warned that they could not remain within ANSWER's permit area.  They were then escorted out of ANSWER's permit area and were offered the use of an adjacent park area not under permit, which they then used for their counter-demonstration.

20.  During the 1997 Promise Keepers demonstration, which brought hundreds of thousands of participants on the National Mall, three counter-demonstration groups sought to intrude into the permit area of the Promise Keepers demonstration.  Consistent with Park Service regulations, the counter-demonstrations were not allowed within the Promise Keeper's permit area.  Instead, the counter-demonstration groups were provided the use of an adjacent park area not under permit to others.

21.  On the weekend of October 12, 1996, the Westboro

Baptist Church sought to protest against homosexuality and the AIDS Quilt that was being displayed under permit on the National Mall. Consistent with Park Service regulations, the counter-demonstration activities were not allowed to intrude within the permit area for the AIDS Quilt. Instead, the counter-demonstrators were provided a permit for their activities on adjacent parkland that was not under permit.

22. Indeed, on the same weekend, intruding anti-immigrant counter-demonstrators were warned and escorted from the Ellipse which was under permit to the Coordinadora 96's Hispanic demonstration. Consistent with Park Service regulations and Park Police practice, the counter-demonstrators were offered a nearby park area not under permit.

23. During the 1995 Million Man March demonstration, which brought between 500,000 to 1,000,000 participants on the National Mall, two counter-demonstrators from the Coalition of Jewish Concerns, who were carrying signs stating "Farrakhan is a Racist" and "Farrakhan = [David] Duke Without the Sheet" and chanting similar slogans, intruded into the permit area of the Million Man March demonstration. Consistent with Park Service regulations and Park Police practice, the counter-demonstrators were informed that they were not allowed within the Million Man March area, they would have to leave or be arrested, and were offered the use of an adjacent park area not under permit.

24.  During the 1993 dedication of the United States Holocaust Memorial Museum, counter-demonstrators submitted applications for park areas that intruded into the area that was needed and set aside by permit for the dedication.  Consistent with Park Service regulations, the counter-demonstrations were given permits to conduct their activities on adjacent available parkland, which they did under permit.

25.  These demonstrations, however, are only a few of the more than 3,000 demonstrations and special events that annually occur on federal parkland in the National Capital Region.

**The April 25 March For Women's Lives demonstration**

26. The March For Women's Lives demonstration promises to be one of the largest demonstrations held in the District of Columbia.

27.  The March For Women's Lives demonstration, which is expected to bring 750,000 participants, centers on "freedom of choice" and involves the use of the National Mall with two massive rallies from different stages along with a march across the Ellipse and various city streets.

28.  Indeed, there is every indication that  March For Women's Lives will be a massive demonstration.  Attached as **Exhibit B** is a <u>Washington Post</u> article entitled "Rallying for One Massive Rally: Abortion Rights Activists Hope To Descend on Mall in 'Historic Numbers'" dated April 15, 2004, that reports that

"[s]ome of the lead coordinators say they expect to match or exceed the turnout of the last major abortion rights march in Washington, an April 1992 demonstration that they said drew 750,000 and police estimated at half a million."

29. For the use of Federal parkland, the March For Women's Lives submitted an application to the National Park Service on April 24, 2003. A copy of the application, which like other applications is revised as organizers refined their event, is attached as **Exhibit A**. The application lists the applicants as the Planned Parenthood Federation of America, NARAL Pro-Choice America, Feminist Majority, and the National Organization For Women, and centers for the initial and main rallies on the National Mall. It also includes the use of other Federal park areas for a march from the Mall to and across the Ellipse, and then on city streets of 15th Street, Pennsylvania Avenue and then back to the Mall on 7th and 4th Streets.

30. As is customary in preparation for a large-scale event, the National Park Service and the United States Park Police worked closely with March organizers and other federal, state and local agencies. Among these agencies was the District of Columbia Government and its Metropolitan Police Department. In planning for any event involving such massive numbers, there were the numerous meetings regarding the permit for the March For Women's Lives, where the parties worked to address public safety

and health concerns and a myriad of details necessary for such a massive event.  Following these discussions and refinements regarding the scope of the demonstration and consistent with National Park Service regulations, the Park Service issued permit 04-0115 for the  March For Women's Lives, a copy of which is attached as **Exhibit C.**

31.  The Park Service's permit specified the various Federal park areas under permit to the March For Women's Lives.  As to the parkland that is at issue in this lawsuit, the Park Service's permit detailed that the National Mall, which was sought in the March's application and is now under permit to them, as the park areas located "between 3rd Street and 15th Street, bounded by and including the north and south sidewalks of Madison Drive and the north and south sidewalks of Jefferson Drive, the west sidewalk of 3rd Street, and the east and west sidewalks of 14th Streets between Independence and Constitution Avenue."

32.  We believe that the March For Women's Lives will need the entire designated areas of the National Mall and its internal and exterior sidewalks authorized under its permit, so that the massive numbers of March participants can be able to walk in and around and engage in their demonstration activities within its Mall permit area and in a safe manner.  As such, we believe that the Mall's interior and exterior sidewalks under permit to the March, and which includes Madison Drive's south sidewalk and

Jefferson Drive's north sidewalk, cannot reasonably permit multiple occupancy.

33.  As pages 5-7 of the Park Service permit 04-0115 extensively details, the Mall will have large numbers of structures and equipment that will be set-up earlier, and that is necessary for such a massive demonstration to reach its gathered participants and others as it is being broadcasted on radio and television.

34.  The March For Women's Lives structures and equipment on the Mall include in part, a 14th Street 40 feet by 40 feet initial rally stage, a 3rd Street 40 feet by 40 feet main stage with two 16 feet by 24 feet wings, and that is interspersed with large numbers of seating and standing areas.  Indeed, there will also be a three-tier press riser, assorted tents, trailers, jumbotrons, generators, sound-delay towers, water stations, trash dumpsters, first-aid tents, and 650 portable restrooms on the Mall, with Madison Drive being used to park media satellite/microwave trucks, complete with extensive cabling between their trucks and television cameras and radio receivers.

35. Based on the Park Police's experience dealing with past large-scale static demonstrations that include the 1995 Million Man March and 1997 Promise Keepers, March participants need to be able to use all of the Mall's sidewalks under permit to them so that they can adequately enter and exit as well as move around

12

their demonstration area.  Indeed, with the vast majority of portable toilets and trash dumpsters being placed in their traditional locations on Madison Drive's south sidewalk and Jefferson Drive's north sidewalk, it is particularly important that all of the Mall's exterior sidewalks that are under permit to the March remain open and available for March participants.

36.  Yet the importance of the Mall's sidewalks becomes even more critical because the March For Women's Lives is not just a single static large-scale demonstration on the Mall.  As detailed earlier, because the March actually involves <u>two</u> large-scale static massive rallies on opposite sides of the Mall at 14th and 3rd Street stages, and is interspersed by a massive march that leaves from and then returns to the Mall, participants need the sidewalks to be able to get into, around, and out of the Mall.

### The April 25 counter-demonstrations

37.  The March For Women's Lives pro-choice demonstration has brought, to-date, applications for two pro-life counter-demonstrations.

38.  The first counter-demonstration was by Randall Terry and the Society For Truth And Justice.  A copy of Mr. Terry's application 04-0563, that was submitted on December 10, 2003, is attached as **Exhibit D**.  Mr. Terry's application sought the use of certain Pennsylvania Avenue sidewalks for 500-1,000 participants, who planned to "hold picket signs in favor of life" and "may use

small mock coffins" "in view of the passing parade [by the March For Women's Lives]." The area requested was not subject to any earlier application. And consistent with Park Service regulations, the Park Service issued Mr. Terry a permit for his counter-demonstration for Freedom Plaza and the Pennsylvania Avenue north and south sidewalks from 15th-7th Streets, a copy of which is attached as **Exhibit E**.

39. The second counter-demonstration was by Rev. Patrick Mahoney and the Christian Defense Coalition, who submitted two applications, and which are the subject of this litigation.

40. A copy of Rev. Mahoney's first application 04-0754, that was submitted on January 20, 2004, is attached as **Exhibit F**. His first application sought the use of Constitution Avenue's south sidewalks from 3rd to 21st Streets, for 100 to 2,000 participants to engage in prayer and "holding signs standing for the dignity of life and speaking against abortion." The area requested was not subject to any earlier application.

41. On February 2, 2004, however, Rev. Mahoney amended his application to request use of the National Mall's Madison Drive's south sidewalk, Jefferson Drive's north sidewalks, and the National Mall's 4th-14th Street east and west sidewalks. On March 17, 2004, he again amended his application to request use of the National Mall's Madison Drive's north sidewalk, Jefferson Drive's south sidewalks, along with an additional display of a

four by eight-foot hand-held helium-inflated "20 week old child." He also indicated that other groups organized by Mr. Terry's Society For Truth And Justice as well as Silent No More could be joining his demonstration, which would then bring a total of between 3,000 to 5,000 participants, who would line the sidewalks with hand-held signs "standing for the dignity of life and speaking against abortion." These areas requested, however, was subject to an earlier application by the March For Women's Lives.

42. The Park Service responded in writing to Rev. Mahoney on April 7, 2004, which is attached as **Exhibit G**, and partially granted and denied his application. Specifically, the Park Service issued a permit authorizing his use of Federal park areas of Constitution Avenue's south sidewalks from 3rd to 21st Streets as described in paragraph 40 above.

43. Pursuant to 36 C.F.R. §7.96(g)(6), (4)(iii)(A)(B)(C), the Park Service denied the other, subsequently amended, portions of his application that sought the use of the Madison Drive's north and south sidewalks, Jefferson Drive's north and south sidewalks, and the 4th-14th Street's east and west sidewalks as described in paragraph 41 above. As the Park Service's letter explained:

> As we detailed earlier, March For Women's Lives demonstration will be occurring on the National Mall from 3rd-14th Streets for the same times you requested. Further, given the size and scope of the March's permitted demonstration--along with its anticipated immense crowd of 750,000 participants--and based on our

15

experience during the large demonstrations such as the 1997 Promise Keepers and 1995 Million Man March, the National Mall and its sidewalks cannot reasonably permit multiple occupancy.

Equally important, your proposed counter-demonstration consisting of between 100 to 2,000 participants and perhaps 3,000 to 5,000 participants would constitute an "unreasonable interference" of the March For Women's Lives permitted demonstration on the National Mall from 3rd-14th Street.  This determination is fully consistent with past judicial decisions that confirm that just one or two counter-demonstrators unreasonably interfere with the permitted events of others on parkland.  In Torossian v. Hayo, 45 F.Supp.2d 63 (D.D.C. 1999), appeal voluntarily dismissed No. 99-5127 (D.C. Cir. June 16, 1999), the District Court found that a two-person counter-demonstration "interfered with the activities carried on by the Million Man March pursuant to its Public Gathering Permit, and the Park Police acted well within their discretion in finding that such interference was unreasonable" to order them to move to another non-permitted location.  Torossian, 45 . . .

Accordingly, beside that the Mall's sidewalks cannot reasonably permit multiple occupancy, we also believe that the counter-demonstration would interfere with the safety, order, and convenience of the participants to the preexisting March For Women's Lives demonstration on the National Mall.  Moreover, Federal parkland in Washington, D.C. annually hosts more than 3,000 permitted demonstrations and special events, some of which attract degrees of passion that exceeds even the abortion debate.  If counter-demonstrators were able to use areas under permit to another's activities, its singular and cumulative impacts would cause significant public safety problems, confusion and disorder that are beyond the ability of limited police resources to control, and would deny participants their right to participate in their own permitted event, without being subjected to the unreasonable interference of others.

As you may know, besides demonstrating on the National Mall, the March For Women's Lives plan to conduct a parade that will start from the 14th Street Kickoff Stage, north up 15th Street, west on Constitution Avenue and north on 17th Street to Ellipse's midpoint then east across the Ellipse, north on 15th Street,

16

east on Pennsylvania Avenue and then back to their 3rd Street Main Stage.  In that regard, consistent with National Park Service regulations, you remain free to express your views outside but adjacent to March For Women's Lives' permitted demonstration areas.

With the enclosed permit 04-0754, you are authorized the use Federal park areas of Constitution Avenue south sidewalks from 3rd to 21st Streets, which will allow your activity to be seen and heard by the March For Women's Lives.  In the event you desire to use other available park areas, pursuant to 36 C.F.R. § 7.96(g)(4)(iii)(A) we hereby propose several alternative park sites: a portion of Freedom Plaza and the areas adjacent to the FBI building and Old Post Office Pavilion sidewalks, all of which are on Pennsylvania Avenue and are ample alternative channels of communication.  Indeed, Randall Terry's Society For Truth And Justice own demonstration under permit for some of the Pennsylvania Avenue sidewalks confirm that counter-demonstrators have the ability to see and be seen by the March.  Finally, insofar as some District of Columbia regulated areas may afford additional alternative areas, you may wish to consider contacting the District of Columbia to request use of public spaces under their jurisdiction....

44.  A copy of Rev. Mahoney's response came in the form of his second application marked 04-1227, which was submitted on April 9, 2004, and is attached as **Exhibit H**.  Rev. Mahoney's second application repeats his request for use of the Madison and Jefferson Drives north and south sidewalks except that he would have fewer participants.

45.  The Park Service's response to Rev. Mahoney dated April 15, which is attached as **Exhibit I**, denied his second application:

Pursuant to 36 C.F.R. §7.96(g)(6), (4)(iii)(A)(B)(C), however, your request is again denied.  As we detailed in our letter to you dated April 7, 2004, the March For

17

Women's Lives demonstration will be occurring on the National Mall and its sidewalks from 3rd-14th Streets at the same time you requested. And given the size and scope of the March's permitted demonstration--along with its anticipated immense crowd of 750,000 participants--and based on our experience during the large demonstrations such as the 1997 Promise Keepers and 1995 Million Man March, the National Mall's sidewalks which is under permit to the March cannot reasonably permit multiple occupancy.

Equally important, your proposed counter-demonstration--even reduced in your second application to 24 participants in contrast to your first application of 100-5,000 "unreasonable interference" of the March For Women's Lives permitted demonstration that will be on the National Mall and its sidewalks from 3rd-14th Street.

. . .

As you know, you are already authorized in permit 04-0754 the use Federal park areas of Constitution Avenue south sidewalks from 3rd to 21st Streets, which will allow your activity to be seen and heard by the March For Women's Lives. Consistent with our earlier letter, in the event you desire to use other available park areas and pursuant to 36 C.F.R. § 7.96(g)(4)(iii)(A) we again propose the same alternative park sites we earlier offered you: a portion of Freedom Plaza and the areas adjacent to the FBI building and Old Post Office Pavilion sidewalks, all of which are on Pennsylvania Avenue and are ample alternative channels of communication....

46. Finally, in a letter dated April 16, 2004, the Park Service offered Rev. Mahoney an additional alternative park site for his counter-demonstration at the 4th Street west side sidewalk that is north of the Madison Drive north sidewalk. This letter, which is attached as **Exhibit J**, asks that he contact the Park Service if he would like to discuss use of this or any of the other alternative park areas earlier proposed.

47. To-date, however, I understand that Rev. Mahoney has not contacted the Park Service regarding any of the alternative

18

park sites.

48.    I understand that the Park Service's letter to Rev. Mahoney dated April 16, 2004 was later provided to the March's attorney.   On April 17, the March's attorney wrote to the Park Service, a copy of which is attached as **Exhibit K**, to object to its offer to Rev. Mahoney of the use of the 4th Street west side sidewalk.   The area that the Park Service offered, however, was not under permit to the March and its potential use by counter-demonstrators should not be a hindrance to the March's use of 4th Street itself, given the Street's six-lane wide width and the Park Police's ability to place appropriate fencing or deploy additional officers as necessary at this area.

49.    I do not believe that the Mall's sidewalks can reasonable permit multiple occupancy of both the March For Women's Lives demonstration and Rev. Mahoney's counter-demonstration.   I also believe that the counter-demonstration would constitute an "unreasonable interference" with the March For Women's Lives permitted demonstration.

50.    Further, and as the Park Service's letters detailed, with the thousands of demonstrations and special events annually occurring on Federal parkland in Washington, D.C., if counter-demonstrators were able to use areas or sidewalks under permit to another's activities, its singular and cumulative impacts would cause significant public safety problems, confusion and disorder that are beyond the ability of limited police resources to

19

control.

51.    Allowing such counter-demonstrations would significantly and negatively impact on the public safety and good order of persons participating in the preexisting permitted demonstration and even on the counter-demonstration itself. Based on past experience, it is highly likely others would wish to invoke a similar right.  The cumulative impact caused by the presence of counter-demonstrators' unreasonable intrusions into the ongoing events of others would cause confusion and disorder.

52.    If counter-demonstrations were to be permitted to unreasonably intrude within areas under permit to others, the United States Park Police, based on its past experiences, anticipates that counter-demonstrations will confront and disrupt their opponents.  This would cause significant public safety and order problems.  It could also result in public disturbances that are beyond the ability of limited police resources to control.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 20th day of April, 2004.

_____
SALVATORE LAURO