UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
REVEREND PATRICK J. MAHONEY,        )
   4019 Duke of Gloucester          )
   Fredericksburg, VA 22407,        )
                                    )
CHRISTIAN DEFENSE COALITION,        )
   109 2nd Street NE                )
   Washington, DC 2002,             )
                                    )
BRANDI SWINDELL,                    )
   4950 North Bradley St.           )
   Boise, ID 83714,                 )
                                    )
GENERATION LIFE,                    )
   4950 North Bradley St.           )
   Boise, ID 83714,                 )
                                    )
         Plaintiffs,                )
                                    )
         v.                         )   Civil No. 04-630 GK
                                    )
                                    )
GALE NORTON, Secretary of the       )
   Department of Interior,          )
   1849 C Street, N.W.              )
   Room 6151                        )
   Washington, D.C. 20240           )
                                    )
THE NATIONAL PARK SERVICE,          )
   1849 C Street, N.W.              )
   Room 3104                        )
   Washington, D.C. 20240           )
                                    )
         Defendants.                )
_____    )
```

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR A TEMPORARY RESTRAINING ORDER

PRELIMINARY STATEMENT

In this action plaintiffs seek to challenge the decision by

the National Park Service on their request for a permit to engage

in counter-demonstration activities on property under permit to

the March for Women's Lives'[MFWL] demonstration, scheduled for April 25, 2004, during which approximately 750,000 demonstrators are expected.  Despite having received a permit to conduct a counter-demonstration at an alternate near-by location, and having been offered additional sites close to the MFWL's demonstration, plaintiffs contend that their First Amendment rights have been violated.[1]

The Park Service denied plaintiffs' request to counter-demonstrate at the specific location they requested because the MFWL had submitted a fully executed application for this area prior to that of plaintiffs.  The Park Service properly determined that the area requested by the MFWL cannot reasonably permit multiple occupancy.  This is especially true since plaintiffs concede that they wish to "speak out against abortion," and the MFWL's demonstration is a "rally for Freedom of Choice."  The law plainly forbids plaintiffs' attempt to interject their beliefs into the MFWL's event.

As demonstrated below, plaintiffs' motion for injunctive relief should be denied.

FACTUAL BACKGROUND

As explained in the accompanying Declaration of Salvatore Lauro [Lauro Dec.], executed and filed on April 20, 2003, the

---

[1] Plaintiff's Complaint raises additional claims that are not the subject of their motion for emergency injunctive relief and thus will not be addressed by defendants in this memorandum.

National Mall has long been a site for demonstrations that champion a wide variety of causes.  Activities on federal parkland have ranged broadly from the lone vigil to rallies involving hundreds of thousands of persons.  Demonstrations on both sides of contentious issues have successfully occurred due to the ability of the Park Service and the United States Park Police to keep competing groups separate and apart, while providing a forum for both sides to express their views.  Id. at ¶ 18.  The Lauro Declaration sets forth numerous examples of demonstrations and counter-demonstrations that have occurred on federal parkland in this region.  Id. at ¶¶ 18-24.  Some of these occurred without incident because counter-demonstrators did not seek to engage in activities within an area under permit to another demonstration; in others, counter-demonstrators had to be removed from the area under permit to another by the Park Service and were offered an alternative site to pursue their counter-demonstration.  Id.

The MFWL's demonstration is expected to be one of the largest demonstrations held in the District of Columbia, with approximately 750,000 possible participants.  The purpose of the demonstration is to rally for "freedom of choice" with respect to the issue of abortion, and involves the use of the National Mall for two massive rallies from different stages, along with a march across the Ellipse and various city streets.  Lauro Dec., ¶¶ 29-

30, 33 & Exh. B.

Almost a year ago, on April 24, 2003, the MFWL applied to the Park Service for a permit for this planned demonstration. Lauro Dec., Exh. A.  The application sought the use of federal park areas for rallies on the National Mall, and for a march stemming from the Mall to and across the Ellipse, and then on to the city streets of 15th Street and Pennsylvania Avenue, and then back to the Mall by way of 7th and 4th Streets.  Lauro Dec., ¶ 29.

In planning for this event, as is customary in planning for any event involving such massive numbers, there were numerous meetings between the MFWL's organizers and representatives from federal, state and local agencies, including the District of Columbia government and its Metropolitan Police Department [MPD]. These meetings were necessary to address public safety and health concerns and the myriad of details necessary for such a massive demonstration.  Following these discussions, and refinements regarding the scope of the demonstration, and consistent with Park Service regulations, the Park Service issued permit 04-0115 to the MFWL.  Lauro Dec., ¶ 30 & Exh. C.

The Park Service's permit detailed that the National Mall, which was sought in the MFWL's application and is now under permit to them, consists of the park areas located "between 3rd Street and 15th Street, bounded by and including the north and

4

south sidewalks of Madison Drive and the north and south sidewalks of Jefferson Drive, the west sidewalk of 3rd Street, and the east and west sidewalks of 14th Streets between Independence and Constitution Avenue." Lauro Dec., ¶ 31.

The Park Service has concluded that the MFWL's demonstration will need the entire designated areas of the National Mall and its sidewalks for its event, in order to ensure that the massive numbers of participants can adequately and safely walk in and around the permit areas. Therefore, the Mall's sidewalks, including Madison Drive's south sidewalk and Jefferson Drive's north sidewalk, cannot reasonably permit multiple occupancy. Id. at ¶ 43-45, 49. This is based in part on the fact that the MFWL demonstration will have large numbers of structures and equipment that will be set-up earlier, and that are necessary for such a massive demonstration to reach its gathered participants and others, as it is being broadcasted on radio and television. Id. at ¶ 34.

The importance of the Mall's sidewalks becomes even more critical because the MFWL is not just a single static large-scale demonstration on the Mall. As detailed in the Lauro Declaration, because the March actually involves two large-scale static massive rallies on opposite sides of the Mall at 14th and 3rd Street stages, and is interspersed by a massive march that leaves from and then returns to the Mall, participants need the

sidewalks to be able to get into, around, and out of the Mall. Id. at ¶ 36.

Following receipt of the MFWL's application for a permit to demonstrate, the Park Service received applications for a permit for the same time period from two pro-life counter-demonstrations. The first application was submitted by Randall Terry and the Society For Truth And Justice, seeking the use of Pennsylvania Avenue sidewalks, on the north and south sides of the street, between 15th and 7th Streets, for 500-1,000 participants, who plan to "hold picket signs in favor of life" and "may use small mock coffins" "in view of the passing parade [by the MFWL]." Because the area sought was not under permit to the MFWL or any other group, and the request was consistent with Park Service regulations, the Park Service issued Mr. Terry a permit for his counter-demonstration. Lauro Dec., ¶¶ 38 & Exhs. D & E.

The second counter-demonstration applications for a permit were submitted by plaintiffs, and these two applications are the subject of this litigation. Plaintiffs' first application sought the use of Constitution Avenue's south sidewalks from 3rd to 21st Streets, for 100 to 2,000 participants to engage in prayer and "holding signs standing for the dignity of life and speaking against abortion." This area had not been requested by MFWL. Lauro Dec., ¶ 40 & Exh. F.

On February 2, 2004, plaintiffs amended their first application to request the use of the National Mall's Madison Drive's south sidewalk, Jefferson Drive's north sidewalks, and the National Mall's 4th-14th Street east and west sidewalks. On March 17, 2004, they again amended their application to request use of the National Mall's Madison Drive's north sidewalk, Jefferson Drive's south sidewalks, along with a request to use an additional display of a four by eight-foot hand-held helium-inflated "20 week old child." Plaintiffs indicated that they were expecting a total of between 3,000 to 5,000 participants, who would line the sidewalks with hand-held signs "standing for the dignity of life and speaking against abortion." The areas encompassed by the amendments to plaintiffs' application were identical to areas previously requested by MFWL. Lauro Dec., ¶ 41.

On April 7, 2004, the Park Service partially granted and partially denied plaintiffs' application. Lauro Dec., ¶¶ 42-43 & Exh. G. Specifically, the Park Service issued a permit authorizing their use of federal park areas of Constitution Avenue's south sidewalks from 3rd to 21st Streets, as initially requested. Id.

Pursuant to 36 C.F.R. §7.96(g)(6), (4)(iii)(A)(B)(C), the Park Service denied the subsequently amended portions of plaintiffs' application, on the grounds that the MFWL's

demonstration would be occurring in the same area and "along with its anticipated immense crowd of 750,000 participants--and based on our experience during the large demonstrations such as the 1997 Promise Keepers and 1995 Million Man March, the National Mall and its sidewalks cannot reasonably permit multiple occupancy." Lauro Dec., ¶ 43 & Exh. G. Additionally, the Park Service concluded that "the counter-demonstration would interfere with the safety, order, and convenience of the participants to the preexisting March For Women's Lives demonstration on the National Mall . . . [as the] singular and cumulative impacts would cause significant public safety problems, confusion and disorder that are beyond the ability of limited police resources to control, and would deny participants their right to participate in their own permitted event, without being subjected to the unreasonable interference of others." Id.

Pursuant to 36 C.F.R. § 7.96(g)(4)(iii)(A), the Park Service proposed several alternative park sites, consisting of a portion of Freedom Plaza and the areas adjacent to the FBI building and Old Post Office Pavilion sidewalks, all of which are on Pennsylvania Avenue along which the March was to occur. Id.

Plaintiffs responded by filing a second application for a permit on April 9, 2004. The second application repeated the prior request for use of the Madison and Jefferson Drives' north and south sidewalks; the number of participants, however, was

reduced to 24.  Lauro Dec., ¶ 44 & Exh. H.

By letter dated April 15, 2004, the Park Service denied plaintiffs' second application, on the grounds that, even though reduced in scope, the requested areas still cannot reasonably permit multiple occupancy and would "unreasonably interfere" with the MFWL's planned demonstration.  Plaintiffs again were offered alternate sites for a counter demonstration.  Lauro Dec., ¶ 45 & Exh. I.

By letter dated April 16, 2004, the Park Service wrote plaintiffs to offer yet an additional alternate site, specifically, the west sidewalk on 4th Street just north of Madison Drive.  Id. at ¶ 46 & Exh. J.  As the MFWL will be proceeding down 4th Street past these sidewalks, the Park Service concluded that this location would provide plaintiffs with ample opportunity to engage in a counter-demonstration.  Id.

A copy of this letter was provided to counsel for MFWL, who responded with a letter dated April 17, 2004, objecting to this offer made to plaintiffs.  Lauro Dec., ¶ 48 & Exh. K.  The MFWL, however, does not seek to challenge this offer.  See Opposition of Intervenor the March for Women's Lives to the Plaintiffs' Motion for Temporary Restraining Order, at 15-16.

### LEGAL RIGHT TO DEMONSTRATE ON FEDERAL PARKLAND

Under Park Service regulations, the term "'demonstrations' includes demonstrations, picketing, speechmaking, marching,

holding vigils or religious services and all other like forms of conduct which involve the communication or expression of views or grievances, engaged in by one or more persons, the conduct of which has the effect, intent or propensity to draw a crowd or onlookers.  This term does not include casual park use by visitors or tourists which does not have an intent or propensity to attract a crowd or onlookers."  36 C.F.R. § 7.96(g)(1)(i). The term "'special event' includes sport events, pageants, celebrations, historical reenactments, regattas, entertainments, exhibitions, parades, fairs, festivals and similar events which are not demonstrations . . . and which are engaged in by one or more persons, the conduct of which has the effct, intent or propensity to draw a crowd or onlookers.  This term does not include casual park use by visitors or tourists which does not have an intent or propensity to attract a crowd or onlookers." 36 C.F.R. § 7.96(g)(1)(ii).

Demonstrations and special events on federal parkland may be held only pursuant to a permit issued by Park Service.  36 C.F.R. § 7.96(g)(2).  However, no permit is required for demonstrations involving twenty-five or fewer persons, "provided that the other conditions required for the issuance of a permit are met and provided further that the group is not merely an extension of another group already availing itself of the 25-person maximum under this provision or will not unreasonably interfere with

other demonstrations or special events." 36 C.F.R. §

7.96(g)(2)(i).

The Park Service may deny an application for a permit based

on the following limiting criteria:

> (A) A fully executed prior application for the same time and place has been received, and a permit has been or will be granted authorizing activities which do not reasonably permit multiple occupancy of the particular area; in that event, an alternative site, if available for the activity, will be proposed by the Regional Director to the applicant.
>
> (B) It reasonably appears that the proposed demonstration or special event will present a clear and present danger to the public safety, good order, or health.
>
> (C) The proposed demonstration or special event is of such a nature or duration that it cannot reasonably be accommodated in the particular area applied for; in that event, the Regional Director shall propose an alternate site to the applicant, if available for the activity ; in this connection, the Regional Director shall reasonably take into account possible damage to the park, including trees, shrubberym other plantings, park installations and statues.
>
> (D) The application proposes activities contrary to any of the provisions of this section or other applicable law or regulation.

36 C.F.R. §b7.96(g)(4)(iii).

<u>ARGUMENT</u>

I.   Plaintiffs Have Failed To Satisfy The Standards For
     <u>The Issuance Of Injunctive Relief.</u>

     A.   Plaintiffs Bear A Heavy Burden To Justify The
          <u>Grant Of Preliminary Injunctive Relief.</u>

It is well settled that injunctive relief is an

extraordinary remedy, and the party seeking it has a substantial

burden of proof.  <u>American Coastal Line Joint Venture</u> v. <u>United</u>

11

States Lines. Inc., 580 F. Supp. 932, 935 (D.D.C. 1983). See, e.g., Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958).  To be entitled to the extraordinary remedy of injunctive relief, a plaintiff must meet this strict burden by showing that: (1) there is a substantial likelihood of prevailing on the merits of its claim, (2) a preliminary injunction is necessary to prevent it from suffering irreparable injury, (3) the threatened injury to the plaintiff outweighs the possible harm to others, and (4) the public interest favors issuance of the injunction.  Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998); Citifed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995); Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977); Virginia Petroleum Jobbers Association, 259 F.2d at 924-925.  "The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."  Wisconsin Gas Co., 758 F.2d at 674.  To constitute irreparable harm, "the injury must be both certain and great; it must be actual and not theoretical."  Id.

Under the foregoing, plaintiffs plainly are not entitled to emergency injunctive relief.  Not only have they failed to demonstrate a substantial likelihood of success on the merits, but they have also failed to show the existence of any

irreparable harm or that they have no adequate remedy at law.[2]
Consequently, as demonstrated below, their motion should be
denied.

> B.   Plaintiffs Are Not Likely To Succeed On The
>      Merits Of This Case.
>
>      1.   A Fully Executed Valid Permit Application
>           For the Area In Question Was Filed
>           Before That of Plaintiffs.

Plaintiffs do not argue that the Park Service has failed to
process permit applications in order of receipt, 36 C.F.R. §
7.96(g)(4)(I), or that a fully executed permit application did
not precede theirs.  Indeed, plaintiffs barely mention the MFWL's
prior permit application.  See Plaintiff's Statement of Points
and Authorities Supporting the Motion for Temporary Restraining
Order [Plaintiff's Mem.], generally.  But under the Park
Service's regulations, the MFWL's permit application, submitted
on April 23, 2003, was "deemed granted" 24 hours after it was
submitted, because it had not been denied by the Park Service.
36 C.F.R. § 7.96(g)(3).  Thus, the MFWL's permit application was
"deemed granted" before plaintiffs even submitted their permit

----

[2] Additionally, although plaintiffs failed to join a necessary
party to this suit, in that the MFWL would be substantially
impacted by the relief sought by plaintiffs, see Fed. R. Civ. P.
19, defendant has been informed by counsel for the MFWL that it
will be seeking to intervene in this case.  Thus, the MFWL can
cure plaintiffs' defect and save plaintiffs from possible
dismissal on this basis.  See Planned Parenthood Federaton of
America v. NPS, 1989 U.S. Dist. LEXIS 3582, * 3 (D.D.C. Apr. 7,
1989) (copy attached as Attachment A).

application, and properly pre-empted plaintiffs' later application unless the area encompassed by the MFWL's application could reasonably permit multiple occupancy.  36 C.F.R. § 7.96(g)(4)(iii)(A).

> ### 2.    Plaintiffs Are Not Entitled to Insert Themselves Into the MFWL's Permit Activities.

Plaintiffs completely ignore an essential ground for the revocation of their permit, that is, the fact that allowing their demonstration in the areas requested would intrude upon the activities authorized by the MFWL's permit for the same area. The Declaration of Alice Cohan, filed with intervenor MFWL's opposition memorandum, explains in detail how such a counter-demonstration would substantially interfere with the MFWL's demonstration.  See id. at ¶¶ 19-24.

As the Park Service letters to plaintiffs explained, the Park Service acts to ensure that each group or individual obtaining a permit for a demonstration or special event may express their views free from interference or unwarranted intrusion from other groups or individuals.  Lauro Dec., Exhs. G & I.  This long-standing policy and practice was upheld initially in Sanders v. United States, 518 F. Supp. 728 (D.D.C. 1981), aff'd without opinion 679 F.2d 262 (D.C. Cir. 1982).

In Sanders, the plaintiff was arrested for silently demonstrating with four signs within the Christmas Pageant of Peace located on the Ellipse.  In upholding the constitutionality

14

of the plaintiff's arrest, the <u>Sanders</u> Court found the regulation under which plaintiff was arrested to be a reasonable time, place, and manner restriction which served a significant government interest.  The Court recognized that the government has a twofold interest:

> The first concerns the safety, order, and convenience of those other citizens already participating in the preexisting event.
>     . . . .
> Second, and more fundamentally, is the interest that citizens are guaranteed the right to participate in events or demonstrations of their own choosing without being subjected to interference by other citizens.  **A physical intrusion into another event for the purpose of interjecting one's own convictions or beliefs is by definition an interference, regardless of how insubstantial or insignificant it might appear.  As such, it is an interference with the rights of other citizens to enjoy the event or demonstration in which they have chosen to participate, and in an area reserved for them**. . . . Plaintiff had an undeniable right to express his views, whatever they were, but not in an area set aside for another event where his intrusion would be an interference.

<u>Sanders</u>, 518 F. Supp. at 730 (emphasis added).

Indeed, an unanimous Supreme Court rejected the contention that a parade organizer may be compelled to include another demonstrator in its organized event.  <u>Hurley</u> v. <u>Irish-American Gay, Lesbian, and Bisexual Group of Boston</u>, 515 U.S. 557 (1995).[3] This is because "every participating unit [in a demonstration]

---

[3] In <u>Hurley</u>, the South Boston Allied War Veterans Council received a permit to hold a parade on public streets.  A group of gay, lesbian and bisexual Irish immigrants sought to form a marching unit within the parade.  <u>Hurley</u>, 515 U.S. at 561-563.

15

affects the message conveyed by the private organizers," and thus an order requiring the inclusion of a group seeking to express a particular message not similar to the organizers' message "alter[s] the expressive content of [the organizers'] [] parade." Hurley, 515 U.S. at 572-573.  This, the Court held, "violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message."  Id. at 573.

More recently, in Torossian v. Hayo, 45 F. Supp.2d 63 (D.D.C. 1999), the District Court found that a two-person counter-demonstration "interfered with the activities carried on by the Million Man March pursuant to its Public Gathering Permit, and the Park Police acted well within their discretion in finding that such interference was unreasonable" to order them to move to another non-permitted location.  Id., 45 F. Supp.2d at 8.

Indeed, the Court in Torossian held that its situation was indistinguishable from Sanders, and agreed with the Court's analysis in Sanders, that a demonstrator "did not have a right to express his views by intruding into an area reserved for another event then in progress, and agreed with the governmental interests that justified preventing one demonstration from interfering with another group's permitted activity:

> The first concerns the safety, order, and convenience of those other citizens already participating in the preexisting event... Second, and more fundamentally, is the interest that citizens are guaranteed the right to

16

> participate in events or demonstrations of their own choosing without being subjected to interference by other citizens.  A physical intrusion into another event for the purpose of interjecting one's own convictions or beliefs is by definition an interference, regardless of how insubstantial or insignificant it might appear.

Torossian, 45 F. Supp. 2d at 67, quoting Sanders, 518 F. Supp. at 729-30.

The Court in Torossian also confirmed that excluding a counter-demonstration from the permitted area of another is not a content-based regulation of speech.  Rather, the Court held that no judgment was being made regarding the counter-demonstrators' views "but rather the degree to which it interfered with the permitted activities of the Million Man March."  And in the case of the plaintiffs, "the Park Police reasonably determined that this interference rose to the level of 'unreasonable interference' within the meaning of 36 C.F.R. § 7.96(g)(2)(i)."  Moreover, citing Kroll v. United States Capitol Police, 847 F.2d 899 (D.C.Cir. 1988), the Court found that the Park Police was enforcing a content-neutral National Park Service regulatory system, of which "[a] lawful and reasonable element of that permit scheme is the protection of a permitted demonstration's interest in being free of unreasonable interference from counter[-]demonstrators."  Torossian, at 68.

Plaintiffs argue that the decisions in Sanders and Torossian are inapplicable, and this Court should find dispositive the Court of Appeals' decision in Mahoney v. Babbitt, 105 F.3d 1452

(D.C. Cir. 1997).  Plaintiffs even create a chart which they argue shows the similarity between the two cases.  Plaintiff's Mem. at 3.  Plaintiffs, however, conveniently gloss over the facts in Mahoney that make it a unique case, starkly different from the circumstances at issue here.

First, in Mahoney it was the government itself that was the permit holder and sought to exclude counter-demonstrators from its special event -- the inauguration of President Clinton.  The National Park Service filed an application on behalf of the Presidential Inaugural Committee for use of Pennsylvania Avenue and the adjacent sidewalks during the inauguration, including for the Inaugural Parade.[4]  Although the government was required to seek a permit when it wanted to use public property for a government-sponsored event, A Quaker Action v. Morton, 516 F.2d 717, 728-29 (D.C. Cir. 1975) [A Quaker Action], the Court of Appeals emphasized repeatedly the fact that the government was not akin to a private party.  Mahoney, 105 F.3d at 1456-57.

Second, the event at issue was not a private one.  As the Court of Appeals observed: "The event in question was the observance of the inauguration of the Chief Executive of the United States, an event less private than almost anything conceivable."  Id. at 1458.

---

[4]  Additional time was sought for this area before and after the Inauguration, in order to set-up and take-down equipment used for the inauguration.

18

Third, the Court of Appeals rejected the government's claim that it was merely seeking to prevent counter-demonstrators from intruding on its event, and found that the Park Service's denial of the plaintiff's permit application was "not only content but viewpoint based."  Id. at 1457.  Although the Court of Appeals recognized that the government was not required "to provide a place for all viewpoints in its parade," the Court concluded that the government had gone too far in trying to extend the area of its event to the sidewalks of Pennsylvania Avenue, where it would allow congratulatory signs but no signs of criticism of the President.  Id. at 1456.

Indeed, it was on this basis that the Court of Appeals distinguished the facts in Mahoney from those in Sanders, upon which the government had relied.  The Court of Appeals found Sanders distinguishable because there was no suggestion in that case that the plaintiff's arrest was based on a disagreement with the content of its views.  Mahoney, 105 F.3d at 1457.

In the final analysis, regardless of the government's right to use public property for a government-sponsored event, and to not be required to provide a place for all viewpoints in that event, the Court of Appeals concluded that the inauguration of the President of the United States could not be held as a public event that was closed to those wishing to express their dissent with the President from the sidelines of the inaugural parade.

None of these distinguishing features of Mahoney are present in the instant case.  The demonstrators involved here are all private entities, not governmental organizations, so there is no claim that the government is trying to suppress speech that is inconsistent with government-speech.  The areas under permit to the MFWL are not overbroad, as the Court of Appeals found in Mahoney.[5]  Indeed, plaintiffs do not argue that the MFWL does not need all the property covered by its permit, and the Declaration of Alice Cohan accompanying the MFWL's motion to intervene and opposition brief details the use to which the MFWL will put the property covered by its permit.

Finally, there is **no** evidence that the Park Service's denial of plaintiffs' permit applications was based on a disagreement with the views intended to be conveyed.  Tellingly, plaintiffs make no real effort to advance such an argument.  Although they argue that the Park Service has impermissibly considered the content of the speech to be conveyed, Plaintiffs' Mem. at 17, they do not argue that the Park Service is trying to suppress their speech based upon its content.  And plaintiffs' claim that the Park Service may not consider the content of speech was squarely rejected by the Court of Appeals in Kroll v. U.S.

[5] This provided a second ground on which the Court of Appeals in Mahoney distinguished its facts from those in Sanders, where there was no evidence that the prohibition extended beyond the area needed and used by the Pageant of Peace.  Mahoney, 105 F.3d at 1457.

20

Capitol Police, 847 F.2d 899, 903 (D.C. Cir. 1988), in which the Court held that "[j]udgments about the message being conveyed by a particular demonstrator . . . are inherent in the implementation of a permit system."  Id. at 903.

Indeed, the Court of Appeals in Kroll remarked upon a scenario on all fours with the instant case.  Explaining their holding that under a permit scheme there must be some consideration of the content of a message, the Court stated:

> To take a familiar example, pro-choice or anti-abortion pickets may not constitutionally be forbidden an opportunity to communicate their respective messages simply by virtue of their nature or content; but the Capitol Police could, we believe, reasonably have concluded that they could lawfully direct an anti-abortion picketer away from an area set aside under a permit to those communicating a pro-choice viewpoint (or *vice versa*).

Kroll, 847 F.2d at 903.  This logically flows from the Kroll Court's conclusion that:

> Preclusion of a message is the evil at which the content-neutrality principle is aimed, not arrangements of a public forum so that individuals and groups can be heard in an orderly and appropriate manner.

Id.

The record in this case clearly shows no effort on the part of the Park Service to preclude plaintiffs' message.  The Park Service has granted a permit to plaintiffs for some of the areas they sought, which consists of the sidewalks on Constitution Avenue.  Significantly, the MFWL will be parading on Constitution Avenue right past the sidewalks under permit to plaintiffs.  By

contrast, in <u>Mahoney</u>, the plaintiffs were expressly excluded from the sidewalks abutting the parade.  <u>Id</u>., 105 F.3d at 1454.

The Park Service also has offered additional areas -- in front of the FBI Building, by Freedom Plaza, and by the Old Post Office Building, all adjacent to Pennsylvania Avenue, and also along 4th street -- that also are areas past which the MFWL will parade.  Indeed, the location offered on 4th Street was close enough to spark a protect from the MFWL.  Lauro Dec., ¶ 48 & Exh. K.

The Park Service has also granted a permit to another counter-demonstrator -- Randall Terry and the Society for Trust and Justice – who also will be on sidewalks abutting a portion of the planned march by the MFWL.  Lauro Dec., ¶ 42.  If the Park Service was attempting to engage in viewpoint discrimination, it has done a remarkably poor job of it.

The MFWL is entitled to use the area plaintiffs' seek that was granted to the MFWL by permit, by virtue of its prior application.  Plaintiffs have no right to compel the MFWL to include them in the MFWL's event.

> 3.   The Park Service's Regulations
>      <u>Are Not Void For Vagueness.</u>

Plaintiffs next argue that they have been denied due process because the Park Service's regulations applicable to their permit application are too vague.  In particular, plaintiffs first cite to 36 C.F.R. § 7.96(g)(3), which states that a fully executed

application is "deemed granted" unless it is denied by the Park Service within 24 hours of receipt.  Surely there is nothing vague about this concept.  See Plaintiffs' Mem. at 7-8.  A common sense reading of this provision demonstrates that "deemed granted" means that if the applicant does not hear from the Park Service within 24 hours of submitting a fully executed application, his application is given the status of "granted," notwithstanding the lack of any Park Service letter indicating such.

Plaintiffs acknowledge, however, that this same section provides that "where a permit has been granted, or is deemed to have been granted . . . the Field Director may revoke that permit" in accord with § 7.96(g)(6).  36 C.F.R. § 7.96(g)(3).  Under § 7.96(g)(6), a permit granted or deemed granted may be revoked on certain specified grounds including, as relevant here,

> when a fully executed prior application for the same time and place has been received, and a permit has been or will be granted authorizing activities which do not reasonably permit multiple occupancy of the particular area.

36 C.F.R. § 7.96(g)(4)(A).  Contrary to plaintiffs' claim, this specific standard does not grant the Park Service "unbridled discretion" to revoke permits at will.  See Plaintiffs' Mem. at 9-10.

With thousands of applications received and the regulatory requirement, found at 36 C.F.R. § 7.96(g)(4)(i), that applications are "processed in order of receipt," the Park

23

Service must occasionally revoke "deemed granted" permits once all the facts become available to the Park Service.  And it was under this provision that the Park Service properly denied plaintiffs' "deemed granted" application.

Moreover, the foregoing "deemed granted" and revocation provisions was specifically approved of -- indeed required -- by the Court of Appeals for this Circuit in A Quaker Action Group. The Court of Appeals in that case stated that the Park Service's permit system must explicitly provide that an application not acted upon by the 24 hour administrative deadline is to be deemed granted.  The Park Service, however, may "exercise an emergency right to withdraw its previously given approval. . . subject [to] express standards promulgated to provide for principled consideration. . . ."  Id. at 735.  Consistent with A Quaker Action, the Park Service then enacted 36 C.F.R. § 7.96(g)(3), with both the "deemed granted" provision and express standards for the revocation of any granted or deemed granted permits. Plaintiffs' claims that these two regulations are vague are without merit.

Plaintiffs next argue that 36 C.F.R. § 7.96(g)(4)(A)'s reference to "multiple occupancy" is void for vagueness. Plaintiffs' Mem. at 10.  On the contrary, the District Court in Planned Parenthood Federation, had no trouble in analyzing claims of multiple occupancy under this regulation.  Attachment A, id.,

24

1989 U.S. Dist. LEXIS 3582, * 2-3.

In <u>Planned Parenthood Federation</u>, the District Court upheld the Park Service's refusal to revoke a permit issued to a counter-demonstration by the American Coalition for Life [Coalition], which was located near the National Organization for Women's demonstration sites.  In upholding the Park Service, the District Court found that the Coalition applied first for the site and that "absent a clear showing of danger, the Court must give deference to the Park Service and the respective police departments because they have the background and information and are in a far better position to judge the question of the public health and safety than this Court."  <u>Id</u>. at *3.

Accordingly, plaintiffs' claims that the Park Service's regulations are void for vagueness cannot withstand scrutiny.

    4.   The Park Service's Regulations Are Constitutionally Valid Time, Place and Manner <u>Restrictions on First Amendment Rights.</u>[6]

Plaintiffs' remaining claims are but a re-hash of unsuccessful arguments they raised in <u>Mahoney</u> v. <u>Babbitt</u>, as can be seen by their erroneous recitation to facts at issue in <u>Mahoney</u> instead of the facts at issue here.  <u>See</u> Plaintiffs' Mem. at 12-13.  For example, plaintiffs argue that the Park Service's regulations provide no limit or guide to the exercise of

---

[6] The Park Service does not dispute plaintiffs' claim that the permit application at issue involves protected speech in a traditional public forum.  Plaintiffs' Mem. at 12-14.

discretion by the Park Service to revoke "deemed granted" permits. Plaintiffs' Mem. at 16. On the contrary, the Park Service's regulations spell out in detail the criteria that must be considered before a "deemed granted" permit may be revoked.

As explained above, a "deemed granted" permit may be revoked on any of the grounds that a permit may be denied in the first instance. See supra at 10-11. Thus, as here, a "deemed granted" permit may be revoked if a prior application for the same time and place has been received, and the activities proposed by the first applicant "do not reasonably permit multiple occupancy of the particular area." A "deemed granted" permit may also be revoked if the proposed demonstration will present a clear and present danger to the public safety, good order, or health, or if the proposed demonstration cannot reasonably be accommodated in the particular area applied for, or if the proposes activities are contrary to any of the Park Service's regulations. 36 C.F.R. § 7.96(g)(3)-(6).

As the Supreme Court found in Thomas v. Chicago Park District, 534 U.S. 316, 323-34 (2002), criteria that contain "standards to guide the official's decision and render it subject to effective judicial review," and that are sufficiently "specific and objective, and do not leave the decision 'to the whim of the administrator,' [citation omitted]," satisfy constitutional requirements. As in Thomas, the criteria set

26

forth by the Park Service which guide a decision to revoke a "deemed granted" permit are sufficiently detailed to pass constitutional muster.

Plaintiffs also argue that there are no standards to guide the Park Service in deciding whether multiple occupancies are reasonable. Plaintiffs' Mem. at 16. Plaintiffs, however, offer no suggestion as to what greater specificity could be provided. Determinations as to what constitutes an "unreasonable" multiple occupancy necessarily are fact-specific and not subject to further delineations in the abstract. Moreover, plaintiffs' argument is foreclosed by the Supreme Court's decision in Thomas. In that case the Court found the Chicago Park District's ordinance specifying grounds for denying an application for a specific event, which included a denial based on a finding that "a permit has been or will be granted to a prior applicant authorizing uses or activities which do not reasonably permit multiple occupancy of the particular park," to be "reasonably specific and objective" and thus consistent with constitutional requirements. Thomas, 534 U.S. at 318-19, 324 & n.1.

Plaintiffs next argue that the Park Service's permit regulations constitute a prior restraint because they inhibit expression before it takes place and grant the Park Service "unbridled discretion" to deny expression altogether. Plaintiffs' Mem. at 17-19. This argument, however, is foreclosed

by the Court of Appeals' decision in A Quaker Action.

In A Quaker Action, a case plaintiffs do not even mention, the Court of Appeals expressly considered whether the Park Service's permit system constituted a prior restraint on First Amendment activity.  The Court of Appeals held that it did.  Id., 516 F.2d at 727.  However, the Court noted that "it is well settled that expressive conduct is subject to both contemporaneous and to prior restraint under certain circumstances."  Id. at 725.  The Court stated that:

> Obviously, conduct that creates a danger to life and property, or that is destructive of public order, may be checked by authorities.  In such situations, when the First Amendment rights of demonstrators compete with other legitimate interests, government may develop a system of restraints, on the otherwise protected conduct, that attempts to accommodate these various competing interests.

Id.  The Court of Appeals went on to say:

> In so holding [that the permit regulation is a prior restraint], we are approving the overall permit system as being justified by the asserted governmental interests, and as being no more restrictive than necessary to preserve those interests. [footnote omitted].

A Quaker Action, 516 F.2d at 727.  See also Kroll v. U.S. Capitol Police, 847 F.2d 899, 903 (D.C. Cir. 1988).

Such a holding is in keeping with the more recent Supreme Court decision in Thomas, in which the Court held that: "Regulations of the use of a public forum that ensure the safety and convenience of the people are not 'inconsistent with civil liberties but . . . [are] one of the means of safeguarding the

good order upon which [civil liberties] ultimately depend." Id.,
534 U.S. at 323 (citation omitted).

Finally, plaintiffs argue that the Park Service was
obligated to seek judicial review of its denial of plaintiffs'
permit. Plaintiffs' Mem. at 20-21. On the contrary, the Supreme
Court in Thomas specifically rejected the claim that a government
entity must initiate litigation when it denies a permit, when the
denial is not based on the subject matter of the proposed speech.
Thomas, 534 U.S. at 322.

The foregoing demonstrates that plaintiffs' remaining
arguments consist of nothing more than a futile attempt to
relitigate issues already settled by the Court of Appeals for
this Circuit and the Supreme Court.

C.    Plaintiffs Have Failed To Establish Irreparable Injury.

The Court of Appeals for this Circuit has repeatedly held
that the issuance of preliminary injunctive relief is dependent
upon a showing of concrete irreparable injury. See, e.g.,
Wisconsin Gas Co. v. FERC, 758 F.2d at 674. Indeed, the Court of
Appeals has noted that while such relief may be available when
there is a particularly strong likelihood of success on the
merits and only a relatively slight showing of irreparable
injury, the moving party still is required to demonstrate at
least "some injury," since the basis of injunctive relief in
federal courts has always been irreparable injury. E.g., Citifed

Financial Corp v. Office of Thrift Supervision, 58 F.3d at 747 (Court requires demonstration of "at least 'some injury'").  When the movant has made no showing of irreparable injury, that alone is sufficient for rejecting the request for preliminary injunctive relief.  Id.

Plaintiffs here have failed to make the requisite showing of irreparable injury.  The Park Service has provided them with a significant amount of federal parkland to disseminate their message, within view of the MFWL's demonstration, and has offered several additional sites.  The law is clear that "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981).  Similarly, it is beyond dispute that "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."  Cornelius v. NAACP Legal Defense and Educational Fund Inc., 473 U.S. 788, 799-800 (1985).

Plaintiffs have been provided with a prominent forum for their message.  Therefore, plaintiffs will suffer no injury, irreparable or otherwise, from the action taken by the Park Service.

C.    <u>The Remaining Factors Do Not Support An Injunction.</u>

Under <u>Virginia Petroleum Jobbers</u>, preliminary injunctive relief may not be granted unless the alleged irreparable harm outweighs the harm to be encountered by other parties and the public interest.  In this case, granting relief to plaintiffs clearly will cause harm to the MFWL and the Park Service, in that it would allow plaintiffs' demonstration to intrude upon the MFWL's event with messages that are not consistent with this event.  <u>See</u> Lauro Dec., ¶¶ 43, 45, 50-52 & Exhs. G & I; Cohan Declaration, ¶¶ 19-24.  As discussed above, the law clearly establishes the right of those engaging in specific events to be free from the unwarranted intrusion of others.  <u>See</u> <u>supra</u>, at 14-22.

Additionally, as the Court in <u>Sanders</u> recognized, a paramount concern is for "the safety, order, and convenience of those other citizens already participating in the preexisting event."  <u>Id</u>., 518 F. Supp. at 729.  Plaintiffs' planned counter-demonstration clearly implicates these concerns.

Accordingly, the balance of the equities clearly lies with the Park Service and with the MFWL.

CONCLUSION

For the foregoing reasons, defendants respectfully submit that plaintiffs' request for emergency injunctive relief should be denied.

Respectfully submitted,

_____

ROSCOE C. HOWARD, JR., D.C. BAR #246470
United States Attorney


_____

MARK E. NAGLE, D.C. BAR #416364
Assistant United States Attorney


_____

MARINA UTGOFF BRASWELL, D.C. BAR #416587
Assistant United States Attorney


Of Counsel:

Randolph J. Myers
Senior Attorney
Office of the Solicitor
U.S. Department of Interior

<u>CERTIFICATE OF SERVICE</u>

I certify that the accompanying Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order, with proposed order, was served upon plaintiff by electronic mail, as agreed to, addressed to:

> James Matthew Henderson, Esq.
> Colby M. May, Esq.
> The American Center for Law and Justice
> 201 Maryland Ave., N.E.
> Washington, D.C. 20002

and upon intervenor-movant, in the same manner, addressed to:

> Neal Goldfarb, Esq.
> Carol Elder Bruce, Esq.
> Tighe Patton Armstrong Teasdale PLLC
> 1747 Pennsylvania Ave., N.W., Suite 300
> Washington, D.C. 20006

on this 21st day of April, 2004.

> MARINA UTGOFF BRASWELL, D.C. Bar #416587
> Assistant United States Attorney
> U.S. Attorney's Office
> Judiciary Center Building -- Rm. 10-413
> 555 4th Street, N.W.
> Washington, D.C. 20530
> (202) 514-7226

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REVEREND PATRICK J. MAHONEY,     )
et al.                           )
                                 )
         Plaintiffs,             )
                                 )
         v.                      )  Civil No. 04-630 GK
                                 )
                                 )
GALE NORTON, Secretary of the    )
  Department of Interior, et al.,)
                                 )
         Defendants.             )
_____)

ORDER

Upon consideration of Plaintiffs' Motion for a Temporary Restraining Order, of all the papers filed in support and in opposition to that motion, and of the entire record, and it appearing to the Court that the denial of plaintiffs' motion would be just and proper, on the grounds that plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims, or irreparable injury, and the balance of the equities lies with defendants, it is by the Court this _____ day of _____, 2004,

ORDERED that Plaintiffs' Motion for a Temporary Restraining Order be, and it is, denied.

_____
UNITED STATES DISTRICT JUDGE

For Plaintiffs:

James Matthew Henderson, Esq.
Colby M. May, Esq.
The American Center for Law and Justice
201 Maryland Ave., N.E.
Washington, D.C. 20002


For Defendants:

Marina Utgoff Braswell
Assistant United States Attorney
Judiciary Center, Room 10-413
555 - 4th Street, N.W.
Washington, D.C.  20530


For Intervenor-Movant:

Neal Goldfarb, Esq.
Carol Elder Bruce, Esq.
Tighe Patton Armstrong Teasdale PLLC
1747 Pennsylvania Ave., N.W., Suite 300
Washington, D.C. 20006

3