**Declaration of Alice Cohan**

Alice Cohan states as follows:

1.  I am the Director of the March for Women's Lives, a rally and march in support of reproductive rights and justice and that will be held on the Mall this Sunday, April 25, 2004. (The term "March for Women's Lives refers to both an event and the group that is organizing that event. I will refer to the overall event as "the March" and the group as "MFWL." I will use the term "the march" (with a lower-case *m*) to refer to the portion of the event that actually devoted to marching from Point A to Point B.)

2.  MFWL seeks to intervene in this action as a defendant and to oppose the plaintiffs' efforts to conduct a counterdemonstration within MFWL's permit area. I submit this declaration to show how the plaintiffs' proposed activities would interfere with the March and infringe on MFWL's First Amendment rights and the rights of MFWL's member organizations and the March participants.

**A. My background and qualifications**

3.  I have had extensive experience in planning and organizing large demonstrations in the District of Columbia. This experience began in the late '60s, when I served as a liaison with police in connection with antiwar demonstrations here. I later became involved in the women's movement and was the key organizer for the major demonstrations here in support of women's rights. These have included the marches in support of the Equal Rights Amendment in the late '70s and early '80s as well as the major pro-choice marches in the '80s and '90s. In these marches, I served either as director of the march or in a position such as logistics director. I have similarly been

involved on the permit negotiating team in organizing major marches in support of lesbian and gay rights.

4.  As a result of all of this work, I have had extensive experience in applying for demonstration permits and in negotiating with the Park Service and other government agencies with respect to such permits.

5.  In addition, I have become extremely knowledgeable about the logistics of putting on a major demonstration in the District of Columbia, and in particular with the demands of holding such a demonstration on the Mall. Many of the demonstrations I have planned in the past were held on the Mall. I am therefore familiar with issues such as the amount of space that will be necessary to accommodate those participating in the March. My past experience has also made me very familiar with the practical and logistical difficulties raised by the presence of anti-abortion counterdemonstrators.

**B.  Background regarding MFWL and the March**

6.  MFWL is an unincorporated association, the members of which are the American Civil Liberties Union, Black Women's Health Imperative, Feminist Majority, NARAL Pro-Choice America, National Latina Institute for Reproductive Health, National Organization for Women, and Planned Parenthood Federation of America. In addition, almost 1,400 other organizations have signed up as co-sponsors. We also have more than 100 Honorary Congressional Co-Sponsors, including 17 Senators and 87 Representatives.

7.  MFWL expects more than 750,000 people to attend and participate in the March.

8.   MFWL applied with the National Park Service for a demonstration permit for the March approximately one year ago, on April 23, 2003. The application requested a permit covering the entire Mall from 1st Street to the Washington Monument grounds. The application also requested a number of other areas, including the Washington Monument grounds, the Lincoln Memorial grounds, the Sylvan Theatre, Lafayette Park, and the Ellipse. Some of these areas have turned out to be unavailable, either because of security concerns or because of ongoing construction.

9.   The Park Service has issued MFWL a demonstration permit that defines MFWL's permit area to include, among other areas, "the National Mall between 3rd Street and 15th Street, bounded by and including the north and south sidewalks of Madison Drive and the north and south sidewalks of Jefferson Drive[.]" Because some of the other areas included in our original permit application are unavailable, as mentioned above, our permit area is significantly smaller than the area that we had originally requested. In addition, significant portions of the Mall within our permit area are fenced off due to ongoing construction, which shrinks the amount of space available to us and increases concerns about crowding and congestion. If as many people attend the March as we expect, our permit area will be just barely sufficient to accommodate them all.

10. Our plans for the March are as follows. Marchers are expected to begin assembling on the Mall around 7:00 a.m. on Sunday. We have encouraged participants to organize themselves in advance into "delegations" and "contingents," and each such group that has registered with MFWL will have an assigned assembly point on the Mall. Volunteers will be stationed on the periphery of the Mall and at Metro stations to direct participants to the proper meeting place. At 10:00 a.m., our morning program, consisting

-3-

of speeches and music, will begin on a stage at the 14th Street end of the Mall. (We will have several Jumbotron screens set up along the Mall so that the program can be seen even by those far from the stage.)

11. The march itself will begin at noon. Marchers will leave the Mall at the point where Madison Drive meets 14th Street (behind the Museum of American History) and then proceed over to 15th Street. The march will follow 15th Street north to Constitution Avenue and turn left (*i.e.*, west). At 17th Street, the march will turn right and continue north along the edge of the Ellipse. The March will turn right and cut through the middle of the Ellipse and then make its way to 15th Street near Pennsylvania Avenue. It will turn right and continue down Pennsylvania to Seventh Street, where it will turn right and head back toward the Mall. Most of the marchers will re-enter the Mall at Seventh Street, but those at the head of the march (dignitaries, leaders of the sponsoring organizations, and other Honored Guests) will instead turn down Constitution Avenue and enter the Mall closer to the stage for the afternoon's activities, which will be located at the eastern end of the Mall, between 3rd and 4th Streets. The afternoon program will begin at 1:00 p.m. and will consist of more speeches and music.

12. We anticipate that it will take about an hour for each marcher to complete the march route, but given the huge number of people we are expecting, some marchers will not even get to the starting point until an hour or two after the march begins. Thus, the entire march will take several hours to complete.

13. We also expect that many of the participants will stay on the Mall without taking part in the March. Similarly, people will be arriving at the Mall throughout the day.

## C. The plaintiffs' counterdemonstration plans

14. The plaintiffs in this action seek to compel the Park Service to grant them a permit to hold a counterdemonstration during the March on the north and south sidewalks of Madison and Jefferson Drives in the National Mall, a location within the permit area granted to MFWL. The plaintiffs originally sought a permit for up to 2,000 people in these locations. When the permit was denied, they sought a permit for 24 people. That permit was also denied.

15. The plaintiffs stated in their permit application that the purpose of their demonstration is "to speak out against abortion." Thus, the message that the plaintiffs wish to convey within MFWL's permit area is diametrically opposed to the pro-choice message that MFWL and its member organizations wish their demonstration activity to convey.

16. Although the plaintiffs are seeking to obtain a permit to demonstrate inside MFWL's permit area, they have already applied for and received a permit for a location *outside* MFWL's permit area: the south sidewalk of Constitution Avenue, N.W., between 3rd Street and 21st Streets. (I understand that their application for this permit stated that their group would include up to 2,000 demonstrators.) The March will pass through that area at multiple points. Moreover, for the dignitaries at the head of the march, the route will go down Constitution Avenue, parallel to the plaintiffs' permit area, for several blocks. Thus, the plaintiffs' existing permit will enable them to communicate their message to those participating in the March. Indeed, it will permit them to reach more of the March participants than they would be able to reach from the Madison and Jefferson Drive sidewalks that are at issue in this case.

17. In addition, the Park Service has offered the plaintiffs a permit to demonstrate at yet another location: the west sidewalk of 4th Street, N.W. between Constitution Avenue and Madison Drive. That location is immediately adjacent to MFWL's permit area. The Park Service has made this offer over MFWL's objection.

18. The Park Service has also issued permits to other anti-abortion groups for locations along the route of the March. Thus, the anti-abortion viewpoint will be prominently expressed while the March is in progress.

## D. How MFWL would be harmed by counter-demonstration activity inside its permit area

19. MFWL and its member organizations recognize and respect the right of anti-abortion groups to express their views in a manner that does not interfere with the March. However, the plaintiffs' desire to hold a counterdemonstration inside MFWL's permit area does not fall into that category. On the contrary, such a counterdemonstration would substantially interfere with the March and with the participants' First Amendment rights. I will now attempt to explain the different ways in which that interference would occur.

20. I will start with logistical issues. First, and most simply, the space in our permit area is limited and any space that is occupied by a counterdemonstrator is space that will be denied to our participants. Even if the number of counterdemonstrators were limited to 24, this would be a serious problem. With the number of people who are expected to attend, we anticipate that the crowd will expand all the way out to the edges of our permit area. (If the weather is warm, the edges of the Mall will be especially crowded, because that is where the trees that can provide shade are found.) Thus, the counterdemonstrators would not simply be standing on the sidelines, they would be in the midst of the action.

21. Moreover, the sidewalks where the plaintiffs seek to demonstrate will be heavily traveled, and the presence of counterdemonstrators is likely to obstruct foot traffic and potentially create bottlenecks. This problem would be made worse by the need to maintain a buffer zone around the counterdemonstrators in order to reduce the risk of a confrontation or disturbance. Such a buffer zone would probably be created by the Park Police, and if they did not do so MFWL's security staff would. (Indeed, it is our plan to keep March participants separated from counterdemonstrators along the march route and from any counterdemonstrators who may be found within or near our permit areas.) Creating a buffer zone on the sidewalks where the plaintiffs wish to demonstrate would increase congestion and obstruct traffic. Yet the alternative of not creating such a buffer zone would be equally unacceptable, because it would increase the risk of a confrontation.

22. This leads us to the issue of safety and security more generally. Given the history of the antiabortion movement, we are very concerned about the risk of disruption and even violence by antiabortion forces. To deal with this threat, we will have a substantial number of volunteers who will be responsible for security and peacekeeping. As noted, they will try to create a buffer zone around any counterdemonstrators, and if the counterdemonstrators refuse to leave they will call police to have them removed. In addition, our security staff will be on the alert for antiabortion activists who are known to have a history of disruption and violence. In fact, our security staff has recruited people who have had experience in defending abortion clinics and who can recognize many of the violent antiabortion protestors on sight. These security efforts will be impaired if the plaintiffs' group is allowed to demonstrate within our permit area, because we will have

to devote a portion of our scarce resources to monitoring them and creating a buffer zone around them. That will of course limit the resources that will be available to deal with problems elsewhere.

23.  Permitting counterdemonstrations within our permit area would also have effects that are less tangible but perhaps even more serious. First, it would interfere with our ability to communicate the pro-choice message that the March is intended to promote. One of the purposes of any mass demonstration is to present a picture to the world (for example, by way of media coverage) of a large group of people who support a particular point of view. This impact will be diminished if signs opposing the March's goals are mixed in with those supporting them. While we respect the right of antiabortion protestors to peacefully express their opinions, we vehemently object to their attempting to use *our* demonstration as a platform for *their* views.

24.  Furthermore, allowing counterdemonstrations within our permit area would interfere with the sense of community and mutual support that we want the March to promote. A demonstration is not only a way for the demonstrators to communicate with the outside world, it is also a way for them to communicate and associate with one another, to create a community of shared values, and to build a movement. The presence in one place of so many people who support the same cause creates a sense of excitement and mutual support among the participants and, hopefully, invigorates them to engage in activities supporting the cause after they go back home. This is an important aspect of the March, and it will be compromised if antiabortion protestors—who are hostile to everything the March stands for—are allowed to intrude themselves into the March.

I DECLARE under penalty of perjury that the foregoing is true to the best of my knowledge, information, and belief.

Executed on April 19, 2004.

Alice Cohan