UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| REV. PATRICK MAHONEY et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-cv-630 (GK) |
| | ) | |
| GALE NORTON et al., | ) | |
| | ) | |
| *Defendants*, | ) | |
| and | ) | |
| | ) | |
| THE MARCH FOR WOMEN'S LIVES, | ) | |
| | ) | |
| *Intervenor.* | ) | |

**Opposition of Intervenor
the March for Women's Lives
to the Plaintiffs' Motion
for a Temporary Restraining Order**

The plaintiffs seek to conduct an anti-choice counterdemonstration inside the permit area granted to MFWL for its pro-choice demonstration. Although the plaintiffs are certainly entitled to express their views in an appropriate time, place, and manner, they are not entitled to express them within an area where another group will be conducting a demonstration of its own. Permitting counterdemonstrations inside MFWL's permit area would unreasonably interfere with MFWL's demonstration and would violate MFWL's First Amendment rights as well as those of of MFWL's member organizations and the other participants in MFWL's demonstration.

The plaintiffs are therefore unlikely to succeed on the merits of their claims. Moreover, the equities weigh heavily against their request for a TRO. The injunction they seek would irreparably harm MFWL's interest. Denying a TRO, on the other hand, would not significantly harm the plaintiffs, for they have already been granted a permit that will

allow them to hold their counterdemonstration in an area where their message will be seen by hundreds of thousands of pro-choice marchers.

Their motion for a temporary restraining order should be denied.[1]

### Statement of Facts[2]

Intervenor the March for Women's Lives ("MFWL") is holding a major march and rally on the Mall this Sunday in support of reproductive rights and justice—an event known as the March for Women's Lives. (We will refer to this event, including both the march and the rally, as "the March" and will use "MFWL" to refer to the organizing entity.) MFWL expects more than 750,000 people to attend, and the plaintiffs do not contend that this expectation is unrealistic.

MFWL applied with the Park Service for a permit for this event almost a year ago, and the Park Service has issued MFWL a demonstration permit that defines MFWL's permit area to include, among other areas, "the National Mall between 3rd Street and 15th Street, bounded by and including the north and south sidewalks of Madison Drive and the north and south sidewalks of Jefferson Drive[.]" (Madison and Jefferson Drives are the roads that run along the north and south edges of the Mall, respectively and that separate the central portion of the Mall from the museums that line Constitution and Independence Avenues.)

---

[1] Given the extremely limited time available to us for opposing the plaintiffs' motion, we will leave it to the government to respond to the plaintiffs' challenge to the Park Service's permit regulations. In addition, we note that although the plaintiffs' complaint asserts claims under the Religious Freedom Restoration Act and the equal-protection component of due process, their TRO motion does not rely on those claims. We therefore do not discuss them here.

[2] The facts set out here are based on the accompanying declaration of Alice Cohan.

Given the number of people who are expected to attend the March, MFWL expects that the crowd of people participating in the March will occupy its entire permit area. The plaintiffs do not suggest otherwise. Nor do they contend that the permit area granted to MFWL is larger than MFWL reasonably needs.

The plaintiffs do not contend that the Park Service should not have included the sidewalks on Madison and Jefferson Drive in MFWL's permit area. Nevertheless, they wish to hold an anti-choice counterdemonstration on those sidewalks. They initially sought a permit for up to 2,000 counterdemonstrators, and when that was denied they sought a permit for 24. That permit was similarly denied, and they now ask the Court to order that they be permitted to hold an anti-choice counterdemonstration *inside* an enormous pro-choice demonstration. The plaintiffs have already been granted a permit on the south sidewalk of Constitution Avenue, a location that will be seen by those participating in MFWL's march, and they have been offered a second location that is even closer to MFWL's permit area, but that is not enough for them. They want to physically intrude their counterdemonstration into MFWL's rally.

We are submitting with this memorandum the declaration of Alice Cohan, MFWL's director. In that declaration, Ms. Cohan describes the plans for the March and explains the various harms that would result if the plaintiffs are permitted to hold their counterdemonstration inside MFWL's permit area. We refer the Court to that declaration, and will discuss the relevant portions of the declaration at the appropriate points in our argument.

**Argument**

**A. The plaintiffs are unlikely to succeed in showing that they are entitled to conduct a counter-demonstration inside MFWL's permit area.**

The plaintiffs' constitutional claims have little chance of succeeding. As we will show, counterdemonstrators have no right to intrude into an area previously set aside for another group's demonstration. Permitting such an intrusion here would substantially interfere with the March and would infringe MFWL's First Amendment rights and the rights of its member-organizations and the other participants in the March. And the case that the plaintiffs primarily rely on—*Mahoney v. Babbitt*—does not remotely apply here.

**1. The plaintiffs have no right to conduct a counter-demonstration in the area for which MFWL has already been granted a demonstration permit.**

The courts have repeatedly held that the First Amendment does not give counter-demonstrators the right to physically intrude into space set aside for demonstration activity by a different group and to hold their counterdemonstration inside the other group's demonstration.[3] Indeed, the D.C. Circuit has addressed this point in *Kroll v. United States Capitol Police*, in language that could have been tailor-made for this case:

> [P]ro-choice or anti-choice pickets may not constitutionally be forbidden an opportunity to communicate their respective messages simply by virtue of their nature or content; but the Capitol Police could, we believe, reasonably have concluded that they could lawfully direct an anti-choice picketer away from the area set aside under a permit to those communicating a pro-choice viewpoint (or *vice versa*).[4]

---

[3] *E.g.*, *Kroll v. United States Capitol Police*, 847 F.2d 899, 903 (D.C. Cir. 1988) (upholding claim of qualified immunity); *Torossian v. Hayo*, 45 F. Supp. 2d 63, 67–68 (D.D.C. 1999); *Sanders v. United States*, 518 F. Supp. 728, 729–30 (D.D.C. 1981), *aff'd mem.*, 679 F.2d 262 (D.C. Cir. 1982).

[4] *Kroll*, 847 F.2d at 903.

To be sure, the court in *Kroll* was dealing with the question of qualified immunity, so its narrow holding was merely that there was no *clearly established* right to intrude into an area set aside for another group's demonstration, rather than that there was no such right at all. But *Kroll*'s holding is nevertheless highly relevant here, because the issue before the Court on the pending TRO motion is whether the plaintiffs are likely to succeed on their claim. *Kroll*'s holding that the right the plaintiffs seek to enforce was not clearly established points to the conclusion that they are unlikely to succeed. And although *Kroll* dealt with the state of the law in 1980, in *Torossian v. Hayo* Judge Lamberth reached the same conclusion with respect to the state of the law more as of 1995.[5] As we will discuss below, the holdings in *Kroll* and *Torossian* remain good law today.

Both *Kroll* and *Torossian* pointed out that inherent in any scheme for issuing demonstration permits is the notion that demonstrators holding a valid permit are entitled to engage in their demonstration activity "free of unreasonable interference from counter-demonstrators."[6] They also explained that prohibiting counterdemonstrations within another group's permit area does not constitute prohibited viewpoint discrimination. As *Torossian* explained, "The relevant characteristic of plaintiffs' speech was not its viewpoint, but rather the degree to which it interfered with the permitted activities of the [permit-holder]."[7]

In addition, both *Kroll* and *Torossian* relied heavily on *Sanders v. United States*, which considered the issue on the merits rather than in the context of qualified

---

[5] *Torossian*, 45 F. Supp. 2d at

[6] *Torossian*, 45 F. Supp. 2d at 68; *see also Kroll*, 847 F.2d at 903–04.

[7] 45 F. Supp. 2d at 67–68; *see also Kroll*, 847 F.2d at 903.

immunity.[8] The court in *Sanders* described the issue before it as whether the plaintiff had the right "to express his views by intruding within an area reserved for another event still in progress[.]"[9] The court held that he did not, for two reasons. First, the government is entitled to prevent such intrusions in the interest of protecting "the safety, order, and convenience of the other citizens already participating in the preexisting event."[10] Second, the court recognized an even more fundamental interest in "guaranteeing citizens the right to participate in events or demonstrations of their own choosing without being subjected to interference by other citizens."[11] Thus, "[a] physical intrusion into another event for the purpose of injecting one's own convictions or beliefs is by definition an interference, regardless of how insubstantial or insignificant it might appear."[12]

The interference caused by the conduct in *Sanders* pales in comparison to the interference that would result from what the plaintiffs want to do in this case. In *Sanders*, a single demonstrator placed small signs under one of the Christmas trees in the annual Pageant of Peace on the Ellipse and then stood next to the tree holding another sign. He was not interfering with pedestrian traffic and there were no large crowds of people. Here, on the other hand, as many as 24 counterdemonstrators propose to protest in the midst of a crowd of 750,000, in an area that will be highly traveled. Moreover, although in *Sanders* the plaintiff's message was unrelated to the purpose of the Pageant of Peace, it was not overtly hostile to that purpose. Here, on the other hand, the plaintiffs wish to

---

[8] 518 F. Supp. 728 (D.D.C. 1981), *aff'd mem.*, 679 F.2d 262 (D.C. Cir. 1982).

[9] 518 F. Supp. at 729.

[10] 518 F. Supp. at 729.

[11] 518 F. Supp. at 730.

[12] *Id.*

intrude into MFWL's permit area to convey an anti-choice message that is diametrically opposed to the pro-choice message the March is intended to convey.

The cases we have been discussing so far have all come from this Circuit. Decisions elsewhere have reached similar conclusions. For example, in *Sistrunk v. City of Strongsville*,[13] the Sixth Circuit held that someone wearing a "Clinton for President" button could lawfully be excluded from a campaign rally supporting George Bush: "To require that the organizers include buttons and signs for Bill Clinton in the demonstration would alter the message the organizers sent to the media and other observers, even if the holders of signs and wearers of buttons did not otherwise interfere with the pro-Bush rally."[14] The same would be true here if the plaintiffs were allowed to inject their anti-choice message into MFWL's pro-choice rally.

## 2. The plaintiffs' proposed counterdemonstration activity would substantially interfere with the March.

The accompanying declaration of Alice Cohan outlines some of the ways in which the plaintiffs' proposed counterdemonstration would interfere with the March. As the declaration explains, Ms. Cohan has had extensive experience in planning large-scale demonstrations on the Mall, so she knows whereof she speaks.[15]

Ms. Cohan begins by addressing logistical issues. The space in MFWL's permit area is limited, and any space that is occupied by a counterdemonstrator is space that will be denied to those participating in the March. Even if the number of counter-demonstrators were limited to 24, this would be a serious problem. With the number of

---

[13] 99 F.3d 194 (6th Cir. 1996).

[14] 99 F.3d at 199.

[15] The discussion that follows is drawn from ¶¶ 19–24 of the Cohan declaration.

people who are expected to attend, the crowd is likely to extend all the way out to the edges of the permit area. Thus, the counterdemonstrators would not simply be standing on the sidelines, they would be in the midst of the action.

Moreover, the sidewalks where the plaintiffs seek to demonstrate will be heavily traveled, and the presence of counterdemonstrators is likely to obstruct foot traffic and potentially create bottlenecks. This problem would be especially serious on the Madison Drive sidewalks, because the march route will begin along Madison Drive, with the embarking from the Mall near where Madison meets 14th Street.[16]

The problem of congestion would be made worse by the need to maintain a buffer zone around the counterdemonstrators in order to reduce the risk of a confrontation or disturbance. Such a buffer zone would probably be created by the Park Police, and if they did not do so MFWL's security staff would. (MFWL plans to create buffer zones around any counterdemonstrators who are found inside its permit area.) Creating a buffer zone on the sidewalks where the plaintiffs wish to demonstrate would increase congestion and obstruct traffic. Yet the alternative of not creating such a buffer zone would be equally unacceptable, for it would increase the risk of a confrontation.

This brings up the issue of safety and security more generally. Given the history of the anti-choice movement, MFWL is greatly concerned about the risk of disruption and even violence by anti-choice forces. To deal with this threat, MFWL will have a substantial number of volunteers who will be responsible for security and peacekeeping. As noted, they will try to create a buffer zone around any counterdemonstrators, and if the counterdemonstrators refuse to leave they will call police to have them removed. In

---

[16] Cohan Decl. ¶ 11.

addition, MFWL's security staff will be on the alert for anti-choice activists who are known to have a history of disruption and violence. In fact, MFWL has recruited people who have had experience in defending abortion clinics and who can recognize many of the violent anti-choice protestors on sight. These security efforts will be impaired if the plaintiffs' group is allowed to demonstrate within MFWL's permit area, because MFWL will have to devote a portion of our scarce resources to monitoring them and creating a buffer zone around them. That will limit the resources that will be available to deal with problems elsewhere.

3.  Allowing a counterdemonstration within MFWL's permit
    area would violate MFWL's constitutional rights and those
    of the other participants in the March.

Ms. Cohan's declaration also explained that the relief the plaintiffs seek would harm MFWL's speech and associational interests in ways that are perhaps more abstract but that are nevertheless highly significant.

First, it would interfere with MFWL's ability to communicate the pro-choice message that the March is intended to promote. One of the purposes of any mass demonstration is to present a picture to the world (for example, by way of media coverage) of a large group of people who support a particular point of view. This impact will be diminished if signs opposing the March's goals are mixed in with those supporting them.[17] While anti-choice protestors are entitled to peacefully express their opinions, MFWL objects to their attempting to use its pro-choice demonstration as a platform for their views.

---

[17] *See, e.g., Sistrunk*, 99 F.3d at 199,

Furthermore, allowing counterdemonstrations within MFWL's permit area would interfere with the sense of community and mutual support that MFWL wants the March to promote. A demonstration is not only a way for the demonstrators to communicate with the outside world, it is also a way for them to communicate and associate with one another, to create a community of shared values, and to build a movement. The presence in one place of so many people who support the same cause creates a sense of excitement and mutual support among the participants and, hopefully, invigorates them to engage in activities supporting the cause after they go back home. This is an important aspect of the March, and it will be compromised if anti-choice protestors—who are hostile to every-thing the March stands for—are allowed to intrude themselves into the March.

These interests are of Constitutional dimension. A private group that sponsors an expressive event such as a parade or a rally has a First Amendment right to control the content of that event, and to exclude from the event anyone who wishes to use the event as a platform for expressing a contrary viewpoint. In *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,[18] the Supreme Court held that the organizers of Boston's St. Patrick's Day parade were entitled to exclude a group that wished to convey a message of gay pride. The Court analogized the selection of the contingents in a parade to a newspaper's exercise of editorial discretion, and explained that "a speaker has the autonomy to choose the content of his own message."[19] The Court went on to hold that a

---

[18] 515 U.S. 557 (1995).

[19] 515 U.S. at 570, 573.

speaker's choice not to propound a particular viewpoint "is presumed to lie beyond the government's power to control."[20]

The Supreme Court has also recognized a comparable right of associational autonomy, holding that the Boy Scouts of America are entitled under the First Amendment to deny membership to adults who are openly gay.[21]

The relief that the plaintiffs seek would violate the autonomy of speech and association that these cases recognize. It would permit the plaintiffs to interfere with the speech and associational rights of MFWL and its member organizations, and of the other participants in the March. If the denial of the plaintiffs' permit request is required to be supported by a compelling governmental interest, that interest is found in the need to protect *those* First Amendment rights. Moreover, the denial of the permit is narrowly tailored to promote that interest, for it imposes no burden on the plaintiffs' right to express themselves outside MFWL's permit area.

4.  This case is nothing like *Mahoney v. Babbitt*.

The plaintiffs rely heavily on *Mahoney v. Babbitt*, a case in which the D.C. Circuit held that Rev. Mahoney could not be prevented from holding a sign critical of President Clinton while standing on the sidewalk during the President Clinton's inaugural parade.[22] But while the plaintiffs contend that *Mahoney* is directly on point, it actually differs from this case in vital respects.

---

[20] 515 U.S. at 575.

[21] *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000).

[22] 105 F.3d 1452 (D.C. Cir. 1997).

First, in *Mahoney*, the Reverend wanted to hold his anti-Clinton sign while standing on the sidewalk in the audience *watching* the parade. While the parade permit purported to include the sidewalk as well as the street, the people on the sidewalk were not part of the parade. This was an important factor in the court's conclusion that *Hurley* did not apply: "Mahoney and his co-plaintiffs do not seek compulsion or even permission to participate in the Inaugural Parade . . . . All they seek is the First Amendment-protected right to stand on the sidewalk and peacefully note their dissent as the parade goes by."[23]

But in this case, the plaintiffs don't want to hold up their signs while they are standing outside MFWL's rally and watching it, they want to hold their signs *inside* the rally. That is a distinction recognized by the Sixth Circuit in its decision holding that there is no constitutional right to wear a "Clinton for President" button during a "Re-elect Bush" rally:

> [P]articipating in the rally as a member of the audience is more akin to marching in the parade itself as one of the less visible marchers [than to watching the parade]. . . . Those seeking admission to the area that was covered by the permit—which area was reasonably necessary to the organizers' expressive activity and was restricted to the use of the organizers and their invitees—were in effect seeking inclusion in the expressive activity itself.[24]

Second, the parade in *Mahoney* was organized by the government, whereas the rally at issue here is being organized by a private group. This governmental-versus-private distinction played an important part in the D.C. Circuit's conclusion that *Mahoney* was distinguishable from *Hurley*. As the court explained, the plaintiffs' expression "is barred directly by the government, not by a private party asserting its own First

---

[23] 105 F.3d at 1456.

[24] *Sistrunk*, 99 F.3d at 199, 200.

Amendment rights." The same is true here. The only reason that the Park Service denied the plaintiffs' application is that their proposed activity would interfere with MFWL's previously approved demonstration.

Finally, *Mahoney* raised the specter of the government trying to silence political opposition by banning speech critical of the President. This case presents nothing of the sort. The current Administration is more sympathetic to the plaintiiffs' anti-choice viewpoint than it is toward MFWL's pro-choice position. By acting to protect MFWL's rally from interference, therefore, the government is not trying to shield itself from criticism. On the contrary, criticism of the Bush Administration's policies will no doubt play a prominent role in MFWL's rally.

5. The plaintiffs' public-forum argument is misguided.

The plaintiffs argue that the sidewalks where they wish to demonstrate are public forums. That is of course correct, but it does not follow premise that the plaintiffs are entitled to demonstrate there during MFWL's rally.

To begin with, the fact that the sidewalks are a public forum does not distinguish them from the rest of MFWL's permit area. The entire Mall is a public forum, so that if the plaintiffs were entitled to demonstrate on the sidewalks simply because they are a public-forum, they would presumably be entitled to demonstrate everywhere else in the permit-area. So the plaintiffs cannot limit the scope of their argument by pretending that it is limited to the sidewalks.

Furthermore, the conclusion that the sidewalks (like the rest of the Mall) are a public forum merely begins the analysis. Speech in a public forum is subject to

-13-

reasonable time-place-and-manner regulations.[25] The Park Service's permit rules constitute such regulations. And those rules codify the ancient common-law principle of Taking Turns. They recognize that there are times when it is not possible to hold more than one demonstration in the same place at the same time. In such cases, counter-demonstrators may not insist on conducting their activities within the area already set aside for the group they are opposing.

### B. The balance of equities tips strongly against the plaintiffs.

The argument above has shown that granting the plaintiffs the relief they seek will inflict irreparable injury on MFWL, its member organizations, and the other participants in the March. We do not understand the plaintiffs to contend otherwise. They do not argue that the injury would not occur and they do not deny that it would be irreparable. Rather than deal with the potential impact of their proposed activities on MFWL, they simply ignore the matter altogether. That is remarkable given that what this case is obviously about is accommodating the competing interests of two groups.

Although granting a TRO would irreparably injure MFWL, denying such relief would not cause the plaintiffs to suffer comparable injury. The plaintiffs will not be prevented from demonstrating at all. Quite the contrary.

The plaintiffs have already obtained a permit for a counterdemonstration on the south sidewalk of Constitution Avenue between 3rd and 21st Streets. That gives the plaintiffs several places where they can demonstrate in full view of the entire march as it goes by: between 15th and 17th Streets, and at the intersection of Constitution and 7th. In

---

[25] *E.g.*, *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293–94 (1983); *Heffron v. Int'l Soc. for Krishna Consciousness*, 452 U.S. 640, 647 (1981).

addition, a portion of the march will proceed east along Constitution for several blocks, and the plaintiffs will be able to reach those marchers as well. And as if that were not enough, the Park Service has offered—over MFWL's objection—to let the plaintiffs demonstrate on 4th Street between Constitution Avenue and Madison Drive, immediately adjacent to MFWL's permit area on the Mall.

Demonstrating at these locations would enable the plaintiffs to reach a far larger audience of pro-choice demonstrators than they could reach if they were allowed to demonstrate inside MFWL's permit area, on the Madison and Jefferson Drive sidewalks at issue in this action. Yet nowhere in the plaintiffs' motion papers is there any explanation of why these locations are inadequate or of why they would be irreparably injured by demonstrating in these areas rather than inside MFWL's permit area.

## C.  Granting a TRO would not serve the public interest.

The plaintiffs contend that the public interest favors the granting of a TRO because they are claiming that their constitutional rights are violated. But as we have noted, *our* constitutional rights are at stake as well.

The plaintiffs go on to claim that the public interest is implicated because permits should not be revoked "on the justification that expression is from an unwelcome or unwanted point of view or on a topic not favored by the Government."[26] In other words, the plaintiffs are apparently claiming that the government is trying to suppress their speech because they oppose abortions (and presumably, is trying to promote MFWL's pro-choice message). To which we can only respond: Where have the plaintiffs been living for the past three years? Didn't anyone tell them who won the last presidential

---

[26] Pl. Mem. 22.

election? Don't they know which party controls Congress? It is *MFWL* whose viewpoint is opposed by the current Administration, not the plaintiffs.

Thus, the suggestion that the Park Service is victimizing the plaintiffs because it wants to suppress their anti-choice views is absurd. The truth is exactly the opposite. By trying to accommodate the First Amendment interests of all parties, both pro-choice and anti-choice, the Park Service has shown a commendable sensitivity to the Constitution. Although we have not agreed with everything the Park Service has done—for example, we have objected to offering the plaintiffs a permit for 4th Street—we are prepared to live with the balance the Park Service has struck and to operate within it. But what the plaintiffs want is for the balance to be struck one-sidedly in their favor. That would disserve the public interest.

### Conclusion

The motion for a temporary restraining order should be denied.

Respectfully submitted,

/s/ Neal Goldfarb
Neal Goldfarb, No. 337881
Carol Elder Bruce, No. 202200
Tighe Patton Armstrong Teasdale, PLLC
1747 Pennsylvania Ave., N.W., Suite 300
Washington, D.C. 20006
(202) 454-2826
ngoldfarb@tighepatton.com
cbruce@tighepatton.com
*Attorney for the March for Women's Lives*

-16-